In re NORTHWEST AIRLINES
CORPORATION et al.,
Debtors.

NORTHWEST AIRLINES
CORPORATION et
al., Appellants,

v.

ASSOCIATION OF FLIGHT
ATTENDANTS–CWA et
al., Appellees.

No. 05–17930(ALG), 06–1679(ALG).

United States District Court,
S.D. New York.

Sept. 14, 2006.

Dan Charles Getman, Law Office of Dan
Getman, New Paltz, NY, for plaintiff.

*DECISION AND ORDER*

MARRERO, District Judge.

## *TABLE OF CONTENTS*

PAGE

I. BACKGROUND ........................................................343

II. INTRODUCTION......................................................344

III. FACTS AND PRIOR PROCEEDINGS ...................................347
 A. FACTS ........................................................347
 B. THE BANKRUPTCY COURT'S DECISION ...........................350

IV. STANDARD OF REVIEW.............................................350

V. DISCUSSION .......................................................351
 A. THE STATUTORY FRAMEWORK ..................................351
 1. The Railway–Labor Act ....................................351
 a. Section 2 (First) of the RLA ...........................352
 b. Section 6 of the RLA and the Status Quo .................352
 2. The Norris–LaGuardia Act .................................355
 3. The National Labor Relations Act .........................355
 4. Section 1113 of the Bankruptcy Code.......................356
 B. LACK OF PRECEDENT HARMONIZING THE STATUTES.............357
 C. WHEN THE RIGHT TO SELF–HELP ACCRUES .....................358
 1. In General................................................358
 2. In the Bankruptcy Context ................................362
 a. Curtailing the Role of the NMB ........................364
 b. Creation of Conflicts between § 1113 and RLA.............366
 c. Accounting for Differences Between the NLRA and the RLA ........370
 D. HARMONIZING THE STATUTES ..................................373
 1. Accommodating the NLGA to the RLA.......................373
 2. Accommodating the NLGA to § 2 (First) of the RLA .................376
 3. The Section 2 (First) Duty in This Case .............................377
 4. Harmonizing the RLA and the Bankruptcy Code .....................379
 E. CONCLUSION.................................................383

VI. ORDER .............................................................384

## I. *BACKGROUND*

Northwest Airlines Corporation ("Northwest") appeals from an order of the Bankruptcy Court rendered on August 17, 2006 denying Northwest's request for a preliminary injunction under Section 2 (First) of the Railway Labor Act ("RLA"), 45 U.S.C. § 152. Northwest had sought to enjoin the Association of Flight Attendants–CWA ("AFA") from carrying out threats to engage in a labor strike or other forms of self-help against Northwest, on the basis that such action would cause irreparable harm to Northwest's estate, unlawful disruption of commerce and of Northwest's operations, and substantial inconvenience to the public. The Bankruptcy Court denied Northwest's motion on the ground that the Norris–LaGuardia Act ("NLGA"), 29 U.S.C. §§ 101 et seq., deprived it of jurisdiction to issue an injunction.

On appeal, Northwest argues that the Bankruptcy Court erred in denying North-

west's motion for a preliminary injunction on jurisdictional grounds. The matter came before this Court on August 18, 2006, by way of an emergency motion to expedite the appeal or in the alternative for an injunction pending appeal. The matter was heard by the Court's Part I judge, who granted the motion for the expedited appeal and set a briefing schedule, with a hearing scheduled for August 25, 2006. The Court received briefing from Northwest, AFA, and several amici and intervenors.[1] The Court heard oral argument on August 25, 2006. At the close of the hearing, the Court issued a temporary injunction pending appeal. The injunction barred the AFA from striking pending this Court's decision on the merits of this proceeding.

The central question before this Court is whether the Bankruptcy Court erred in determining that it lacked jurisdiction to enjoin a strike in the circumstances this case presents, which the Bankruptcy Court characterized as one of first impression. Specifically, the issue presented is whether, following rejection of a collective bargaining agreement in accordance with § 1113(c) of the Bankruptcy Code, 11 U.S.C. § 1113(c) (" § 1113(c)"), by an insolvent carrier engaged in collective bargaining under the process prescribed in RLA Section 6, a court, pursuant to authority drawn from application of Sections 2 (First) and 6 of the RLA, may enjoin a union from striking in response to such rejection, or whether the granting of such injunction is barred by Section 4 of the NLGA, 29 U.S.C. § 104. This Court holds that a court may enjoin a strike under these circumstances, and that the Bank-

ruptcy Court erred in determining otherwise. For the reasons set forth below, the order of the Bankruptcy Court is reversed.

## II. *INTRODUCTION*

This case has drawn extensive public attention. A large number of intervenors, amici curiae and interested third persons, including the United States, have appeared in favor of and against the Bankruptcy Court's ruling here on appeal. The Court has also received in Chambers voluminous correspondence, inquiries and other communications from concerned individuals and members of the press. Mindful of such wide-ranging public interest, the Court here departs somewhat from the traditional model of judicial opinions. To ease understanding of the long and complex analysis that follows, the Court's ruling begins with an overview of the decision. This syllabus states the Court's conclusion, explains the conceptual approach and framework for the decision, and provides advance insight into the considerations the Court found most compelling, in particular the applicable legal principles and Congressional mandates on which the outcome here ultimately rests.

The legal dispute this litigation presents occurs at the junction of four related statutes Congress has enacted in the field of labor law: the Railway Labor Act, the Norris–LaGuardia Act, the National Labor Relations Act, and certain provisions of the Bankruptcy Code. Various terms, legal principles and case law deriving from each of these statutes have been invoked by the parties and their supporters as bearing on the resolution of the dispute at hand.

---

1. In addition to the briefing from Northwest and the AFA, this Court received and reviewed briefing submitted by the United States; amicus curiae Air Transport Association of America, Inc. and Airline Industrial Relations Conference; amicus curiae International Association of Machinists and Aerospace Workers; amicus curiae Aircraft Mechanics Fraternal Association; intervenor Air Line Pilots Association, International; and the Official Committee of Unsecured Creditors of Northwest Airlines Corporation.

Some of these laws are of general application, while others are more specific. But whether working individually or in tandem they all regulate vital aspects of the relationship between workers and employers so as to promote industrial peace and prevent interruption to the flow of the nation's commerce. In most ways the statutes are complementary and have co-existed in complete harmony. From time to time, however, at the edges where they intersect, as more specifically detailed below, some actual and potential conflicts of legislative policies and goals have arisen from application of two or more of these laws in particular disputes.

The incidence of different Congressional enactments in the same field touching upon the same subject and creating legislative tension and conflicts of public policies is not uncommon. Here, the existence of not two but at least three and possibly four statutes substantially affecting the outcome of the case presents unique challenges. For the Court, as longstanding doctrine has repeatedly affirmed, these circumstances give rise to a threshold duty: to view the terms, policies, purposes and structures of the applicable laws as a whole and to read any clashing provisions in a manner that endeavors to accommodate them as much as possible, to this end giving effect to each statute and allowing them to co-exist insofar as they are not irreparably at odds. See *F.C.C. v. NextWave Personal Commc'ns Inc.*, 537 U.S. 293, 304, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003).

One essential consideration in this assessment merits considerable weight. Congress, in legislating in the same subject at different times and for different reasons, in permitting the various statutes here at issue to remain in effect despite perceived or apparent conflicts among some of their provisions, and in allowing their application to evolve through judicial interpretation, has thus evinced a considered judgment to design an integrated and well-ordered scheme of labor law. The legislative structure that thus has tacitly emerged may be conceived as having distinct parts, each statute occupying and functioning within its own sphere, yet standing on common ground that equally supports the independent and combined operation of the others, even where their planes and segments conjoin or overlap. Any arrangement of the separate pieces that heavily stresses the role of any one or two parts resting alone, while overlooking or unduly minimizing the central purposes of the others, is bound to be flawed. Almost inevitably such a view would produce results that fail to achieve to the fullest extent possible the most congruous and reasonable accommodation of related Congressional policies and their corresponding public ends.

Regrettably, the difficulty of the Court's task is compounded in this case because to a large measure the arguments that the parties, and to some extent the conclusion of the Bankruptcy Court, have presented to the Court reflect just such a shortcoming. In sum, by focusing disproportionately on one or two of the statutes to an unwarranted exclusion of the application and implications of the others, their analysis suggests a two-dimensional solution to a three-dimensional problem. In this manner, as this Court earlier characterized the flaw, the parties' approach is akin to an attempt to stand the weight of their shaky propositions on two legs of a stool.

Here, in carrying out the mandate that longstanding principles of statutory interpretation compel, the Court highlights what it considers a point of departure: the exceptional recognition Congress has accorded to the importance of the nation's interstate transportation system of rail-

roads and airlines. As attested by the legislative history of the Railway Labor Act described below, Congress has gone to extraordinary lengths to legislate its view of the vital role that these carriers play for the economy, national security, movement of goods and people, and general well-being of the United States. In the contribution of these critical services to national needs is embedded the abiding public interest that imbues the goal of maintaining the operations of such carriers free from interruption by labor strife. For this reason, any interpretation of how the various provisions of the labor laws here at issue fit and function most compatibly should define a systemic vehicle of public policy. Conversely, a reconciliation of conflicting enactments should not yield anomalies absurdly at odds with the best judgment of the intent Congress would manifest when provisions of different laws clash, or the particular arrangement of related policies to which Congress would give effect had it squarely addressed whatever statutory disharmony may be at hand. *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir.1975) (noting that in an instance of Congressional silence concerning the intended application of certain statutes, the interpretation the court adopted rested on case law and commentary regarding comparable situations "and on our best judgment as to what Congress would have wished if these problems had occurred to it").

It would be ironic indeed were the Court to conclude that by virtue of the interplay of provisions of several statutes enacted to bring about peaceful solutions to labor disputes in the railroad and airline industries and to avoid disruptions of commerce and the operations of carriers, what Congress envisioned would result from the Court's notion of the most reasonable accommodation of any tension between parts of those statutes and other labor laws was to justify a potentially disastrous walkout by an airline's employees. Equally ironic would be for the Court to conclude at the same time that a debtor's lawful resort to a Bankruptcy Code provision meant to keep an insolvent business running while it reorganizes its debts would serve as the automatic trigger point to end the procedures Congress mandated to govern amicable settlement of major labor disputes involving carriers, and thereby prompt an immediate strike that could spell doom by liquidation to that airline. Framed in graphic terms, if the device Congress contemplated by enacting an orderly system of interrelated labor laws were envisioned to form and function agreeably as an engine, an interpretation of statutory provisions that conveys that design would better accord with the lawmakers' overarching purpose if it presumed that the separate parts of legislation would best align when they serve to drive Congress's policy goals forward, and not when isolated pieces of them were arranged to bring about a train wreck (or plane crash).

Consequently, in this Court's view, it would give more plausible expression to Congressional purpose to view the labor statutes at issue, as applied to the facts evidenced in this case, to construct a standing forum and negotiating table and to put in place a process meant for continuous peaceful resolution of major labor disputes involving carriers, rather than to grant the parties a premature license to engage in open industrial hostilities. More specifically, the relevant legislation should be construed as a whole to prescribe a coherent scheme for resolution of labor disputes in the railroad and airline industries that, when operating most properly, and absent any clear incidence of illegality, bad faith or unreasonable conduct by either party, would serve several ends to the

maximum extent possible: maintain an insolvent carrier running, keep the disputants at the negotiating table in continuous collective bargaining under the auspices of the neutral public mediator Congress inserted into the process, and postpone the final day of reckoning for any declaration that an unbreakable impasse has been reached. During its course, this collective bargaining procedure would still preserve the ability of both labor and management either to mutually adjust for any gains or losses that may have occurred in their bargaining positions while the process remained in effect, or eventually to resort to self-help when the mediator declares that all peaceful means to settle the parties' differences have been exhausted.

As discussed below, the accommodation the Court adopts of the labor law provisions at issue here reflects this Court's best judgment of a statutory reading most consistent with what Congress's overall legislative design and policies contemplated. For this construction the Court has drawn support from the terms of the various statutes involved, from their legislative histories, express public policies and structures viewed as a whole, as well as from principles of statutory construction and relevant precedents in case law of the Supreme Court, the Second Circuit and other courts.

In applying its reading of the statutes to the facts and issues raised in this case, the Court is persuaded that Northwest is entitled to preliminary injunctive relief because the position of the AFA in seeking to engage in a strike against Northwest under the circumstances prevailing here viewed as a whole does not demonstrate that the AFA and its members have sufficiently exerted every reasonable effort to settle the parties' dispute without disruption to commerce or to Northwest's operation. To this extent the Court concludes that the AFA's conduct would be inconsistent with the mandates and purposes of the Railway Labor Act and would undermine a remedy authorized by the Bankruptcy Code that would promote the reorganization of a carrier. The Court is also satisfied that the relief it finds appropriate is permissible under the Railway Labor Act, the terms, policies and structure of which here govern and supersede any contrary provisions and purposes of the Norris–LaGuardia Act and the National Labor Relations Act.

### III. FACTS AND PRIOR PROCEEDINGS

#### A. FACTS

Northwest and its affiliated debtors filed Chapter 11 petitions in the Bankruptcy Court on September 14, 2005. By motion dated October 12, 2005, Northwest sought an order pursuant to § 1113(c) permitting rejection of its nine collective bargaining agreements with six different unions. At that time, the flight attendants were represented by the Professional Flight Attendants Association ("PFAA"). PFAA and Northwest had been in collective bargaining negotiations since December 2004.[2]

Thereafter, as required by § 1113,[3] Northwest pursued consensual reductions

---

2. *See* Brief of the Association of Flight Attendants–CWA, dated Aug. 23, 2006 ("AFA Br."), at 2 (*citing* Transcript of Evidentiary Hearing before Bankruptcy Court, August 9, 2006 ("Tr."), Vol. 1, at 12 (Testimony of Julie Hagen Showers, Northwest's Vice President of Labor Relations).).

3. After proposing changes to the collective bargaining agreement, and prior to a hearing for rejection before the Bankruptcy Court, the debtor must "meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement." 11 U.S.C. 1113(b)(1)(2).

in labor costs with each union and reached agreements with each group of its unionized employees except for the flight attendants. Specifically, a March 1, 2006 agreement between Northwest and PFAA was submitted to the membership for ratification but voted down by a four-to-one margin.

On June 29, 2006, and by follow-up order (the " § 1113 Order") on July 5, 2006, the Bankruptcy Court granted North- west's § 1113(c) application with respect to the flight attendants. The Order authorized Northwest to reject its collective bargaining agreement[4] with the flight attendants and permitted the company to institute new terms and conditions that substantially tracked the March 1, 2006 agreement, effective as of July 17, 2006.[5] As required by § 1113, the Bankruptcy Court found that rejection of the collective bargaining agreement was necessary to

---

4. On the record before this Court, it is unclear whether such agreement existed by reason of the contract itself or by reason of the invocation of the RLA's status quo provisions, leaving the last valid agreement in place even after its expiration date while new terms are negotiated. The transcript of the hearing before the Bankruptcy Court indicates that the flight attendants' contract became "amendable" on June 1, 2005, required bargaining six months before, in December 2004, and that such bargaining occurred. (*See* Tr., Vol. 1, at 12.) An "amendable" date typically provides that the agreement will continue through the amendable date and thereafter unless written notice of intended change is served in accordance with RLA Section 6 within a specified period prior to the amendable date. Railway and Airline Labor Law Comm., Am. Bar Ass'n, *The Railway Labor Act* 376–77 (Michael E. Abram et al. Eds., 2d ed.2005). Courts have disagreed on the effect of such a clause. *See id.* Some courts have interpreted the underlying agreements to terminate or expire on their amendable date if the party has served a timely Section 6 notice. *See, e.g., International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Aloha Airlines*, 776 F.2d 812, 816 (9th Cir.1985) ("As of [the contract's expiration date], there was simply no existing collective bargaining agreement to interpret. There is nothing in the Railway Labor Act which extends a contract beyond its termination date.... [T]he Act creates a statutory status quo."). Other courts have concluded that Section 6 artificially extends the life of such agreements. *See, e.g., Manning v. American Airlines, Inc.*, 329 F.2d 32, 34 (2d Cir. 1964) ("The effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination."). The Seventh Circuit has stated that "collective bargaining agreements governed by the Railway Labor Act do not expire on their expiration dates. The Act abhors a contractual vacuum. If on the date of expiration the parties have not negotiated a replacement agreement (and they had not here, and still have not), the old agreement continues in force." *Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1398 (7th Cir.1990). During oral argument before this Court, counsel for amicus curiae Air Transport Association of America and the Airline Industrial Relations Committee stated that the underlying collective bargaining agreement between the parties expired by its terms some time ago, and that what has been in place since such expiration is the status quo. (*See* Hearing Transcript, Aug. 25, 2006, at 37.) Such counsel also stated that Railway Labor Act contracts, in effect, do not expire, because after their expiration dates they are held in place by operation of law, and that the question of whether the contract remains in place or the status quo instead of the contract is theoretical. (*Id.* at 41–42.) The question concerns this Court because it raises the issue of what collective bargaining agreement was being rejected through the § 1113 Order. The parties have apparently proceeded on the theory that it was the terms of the last contract which were in effect and of which the Bankruptcy Court authorized rejection.

5. The June 29, 2006 opinion held Northwest was entitled to an order authorizing rejection of its collective bargaining agreement and that following a fourteen-day period for further negotiations, Northwest could institute terms and conditions of employment not materially different from those described in the March 1, 2006 agreement. The July 5, 2006 order granted this relief and authorized Northwest to implement such terms and conditions on July 17, 2006.

permit Northwest's reorganization; that the union did not have good cause to refuse to accept the March 1, 2006 agreement; and that the balance of the equities clearly favored Northwest's rejection of the agreement. In addition, the Bankruptcy Court rejected Northwest's argument that the Order should authorize the company to impose the terms and conditions of a prior proposal made to PFAA on February 22, 2006, the last offer on the table before the March 1, 2006 agreement was reached. Instead, it held that, in assessing the good faith and good cause requirements of § 1113 under the circumstances, Northwest should be required to impose terms and conditions not materially different from the terms of the March 1, 2006 agreement. No party appealed the Bankruptcy Court's § 1113 Order.

Concurrently, the AFA was seeking certification as the flight attendants' representative in a proceeding before the National Mediation Board ("NMB"). On July 7, 2006, two days after the Bankruptcy Court's July 5, 2006 § 1113 Order, the AFA succeeded PFAA as the flight attendants' certified bargaining representative.

Northwest did not immediately implement the terms authorized by the Bankruptcy Court in its § 1113 order. Instead, Northwest and the AFA continued to negotiate for a consensual resolution, and on July 17, 2006, Northwest and the AFA reached a new agreement. In light of this development, Northwest refrained from imposing the new terms and conditions of employment that had been authorized by the § 1113 Order. However, on July 31, 2006, the flight attendants rejected the new agreement, although this time by a

closer margin of 55 percent to 45 percent. Thereafter, on July 31, 2006, Northwest implemented the terms and conditions authorized by the Bankruptcy Court in its § 1113 Order. By Northwest's account, without these changes, Northwest would have faced incrementally higher costs of approximately $30 million per month, as well as operational disruptions.

The same day that Northwest implemented the new terms and conditions, the AFA notified Northwest that it would strike, as early as August 15, 2006.[6] In light of recent terrorist threats to air travel, the AFA delayed the strike deadline by ten days, until August 25, 2006 at 10:01 p.m. Eastern Standard Time. AFA indicated that it intended to engage in its trademarked "CHAOS" ("Create Havoc Around Our System") strike campaign, a system consisting of "a series of tactical maneuvers up to and including intermittent strike actions legal under the Railway Labor Act," which "may take many forms," including "a mass walkout for a day or a week at a time, with no advance notice to the company or to the passengers"; striking "a certain domicile or a certain piece of equipment"; striking "the entire system for 15 minutes" or "all of the odd numbered gates in Detroit for a day"; or asking flight attendants "to walk off individual flights at random and with no warning." (Northwest Flight Attendants AFA–CWA, "What is CHAOSTM?", http://www. nwaafa.org/default.asp?id=184, attached to Ex. 12 of Declaration of Brian P. Leitch, dated Aug. 17, 2006, as "Northwest's Exhibit 19".)

On August 1, 2006 Northwest filed a complaint for declaratory and injunctive

---

**6.** AFA also filed a motion seeking an order directing that if Northwest imposed any new terms and conditions of employment under § 1113, the company should be obligated to substitute the terms of the failed July 17, 2006 agreement. The Bankruptcy Court denied this motion in the same order in which it denied Northwest's motion to enjoin an AFA strike. Any appeal of that part of the Bankruptcy Court's order is not before this Court.

relief against the AFA and moved by order to show cause for a preliminary injunction barring the AFA from striking. Northwest sought a declaratory judgment that the threatened strike activity violates the RLA, and an injunction barring the union from striking until it had complied with its RLA Section 2 (First) duties. The Bankruptcy Court held a hearing on August 9, 2006, and on August 17, 2006 denied Northwest's motion.

## B. THE BANKRUPTCY COURT'S DECISION

The Bankruptcy Court recognized that the threatened strike would have serious adverse affects on Northwest's prospects for reorganization and on the traveling public. (*See* Memorandum of Opinion and Order, dated Aug. 17, 2006 ("Op."), at 6.) It found that the evidence on the record suggested that "the threat of CHAOS would likely cause the Debtors serious injury, perhaps leading to their liquidation, and that it would be highly detrimental to the interest of the public in a sound and reliable transportation system." (*Id.* at 7.) It further found that there is "no question" that the public interest was involved, pointing out that Northwest carries 130,-000 passengers per day, has 1,200 departures per day, is the one carrier for 23 cities in the country, and provides half all airline services to another 20 cities. (*Id.* at 7 n. 7.)

However, the Bankruptcy Court concluded that under the NLGA, it had no jurisdiction to enjoin the AFA strike. It reasoned that in general, the NLGA divests federal courts of jurisdiction to enjoin strikes in labor disputes. Although acknowledging that the NLGA's prohibition against labor-related injunctions does not deprive federal courts of jurisdiction to enjoin work stoppages that violate provisions of the RLA, the Bankruptcy Court

determined that under the facts presented here, no such RLA violation could be found.

In assessing whether the AFA had violated its obligations under the RLA, the Bankruptcy Court first noted the scarcity of precedent addressing the precise situation facing the parties. It then examined the RLA's structure and purpose as affected by the Bankruptcy Code, and concluded that "[n]othing in § 1113 ... suggests that rejection should trigger an implied obligation on the part of the parties to continue to bargain." (Op. at 16.) The Bankruptcy Court analogized the situation before it to an employer's unilateral action in changing the RLA-mandated status quo that in turn frees employees to take job action. Once the debtors act under § 1113 to reject a collective bargaining agreement, according to the Bankruptcy Court, the union is released from its obligations to continue negotiations under the process prescribed by the RLA. In sum, the Bankruptcy Court held that "Section 1113 of the Bankruptcy Code gives the employer a right to change the status quo and institute new terms and conditions of employment. But if it exercises this power it cannot bind the union anew to the almost endless requirements of negotiation and mediation provided for in the RLA." (Op. at 19.) Since the union's threatened strike activity in these circumstances did not, in the Bankruptcy Court's opinion, constitute a violation of the RLA, the NLGA deprived it of jurisdiction to enjoin the strike. This appeal followed.

## IV. STANDARD OF REVIEW

In general, a district court reviews a bankruptcy court's factual findings under a clearly erroneous standard and reviews its legal conclusions de novo. *See Truck Drivers Local 807 v. Carey Transp.*

*Inc.,* 816 F.2d 82, 88 (2d Cir.1987); *In re Duffy,* 344 B.R. 237, 242 (S.D.N.Y.2006); *In re DG Acquisition Corp.,* 213 B.R. 883, 884 (S.D.N.Y.1997). In the context of reviewing a decision to grant or deny preliminary injunctive relief, the standard of review is abuse of discretion. *See In re Adelphia Commc'ns Corp.,* No. 04 Civ. 2817, 2004 WL 2186582, at *7 (S.D.N.Y. Sept. 27, 2004); *McCrory Corp. v. Ohio,* 212 B.R. 229, 231 (S.D.N.Y.1997). Abuse of discretion may be found where the Bankruptcy Court "has relied on clearly erroneous findings of fact or on an error of law." *In re Adelphia Commc'ns Corp.,* 2004 WL 2186582, at *7; *see In re Blaise,* 219 B.R. 946, 950 (2d Cir. BAP 1998) ("The bankruptcy court abuses its discretion if it bases its decision on an erroneous view of the law or upon clearly erroneous factual findings.").

## V. *DISCUSSION*

### A. *THE STATUTORY FRAMEWORK*

This case presents a controversy that arises at the intersection of four statutes invoked by the parties: the Railway–Labor Act, the Norris–LaGuardia Act, the National Labor Relations Act, and § 1113 of the Bankruptcy Code. Accordingly, a brief overview of each is in order.

#### 1. *The Railway–Labor Act*

The RLA, 45 U.S.C. §§ 151 et seq., was enacted in 1926 after decades of labor unrest had demonstrated the shortcomings of every prior legislative attempt to address the problem of amicable resolution of labor disputes in the railroad industry. *See Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employees,* 481 U.S. 429, 444, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987); *The Railway Labor Act* 29–30. Uniquely a product of employer-employee collaboration, the RLA was drafted and agreed to by representatives of the rail-road companies and the railroad employee unions, and Congress formally enacted this agreement. *See Burlington,* 481 U.S. at 444, 107 S.Ct. 1841; *Chicago & N.W. Ry. Co. v. United Transp. Union ("Chicago & North Western"),* 402 U.S. 570, 576, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 758, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *The Railway Labor Act* 3. The RLA was amended in 1934, primarily to strengthen employee self-organization rights and to create a National Railroad Adjustment Board for resolution of minor disputes. *See Street,* 367 U.S. at 759–60, 81 S.Ct. 1784. It was again amended in 1936 to bring the airline industry within the scope of its coverage. *See* 45 U.S.C. § 181 (extending RLA provisions, except for those involving National Railroad Adjustment Board, to air carriers); *Summit Airlines, Inc. v. Teamsters Local Union No. 295,* 628 F.2d 787, 788 n. 1 (2d Cir. 1980).

The purposes of the RLA as expressed in the statute are:

(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this Act; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agree-

ments covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a.

■ In succinct terms, as acknowledged by the courts, the "primary goal" of the RLA is "to settle strikes and avoid interruption to commerce." *Burlington,* 481 U.S. at 451, 107 S.Ct. 1841; *see Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union ("Detroit & Toledo"),* 396 U.S. 142, 148, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) ("The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce."); *id.* at 154, 90 S.Ct. 294 (describing "the prevention of strikes" as the RLA's "primary objective"); *Texas & New Orleans R.R. Co. v. Brotherhood of Ry. & S.S. Clerks,* 281 U.S. 548, 565, 50 S.Ct. 427, 74 L.Ed. 1034 (1930) ("[T]he major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes.' ").

### a. Section 2 (First) of the RLA

To promote these purposes, in Section 2 (First) the RLA places a duty upon carriers and employees to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152.

■ This Section 2 (First) duty is " 'the heart of the Railway Labor Act.' " *Chicago & North Western,* 402 U.S. at 574, 91 S.Ct. 1731 (*quoting Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377–78, 89 S.Ct. 1109, 22 L.Ed.2d

344 (1969)). It is for this reason that in *Chicago & North Western* the Supreme Court held that Section 2 (First) was not a "mere statement of policy or exhortation," but rather, a "legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis," and enforceable by the judiciary, even by injunction if necessary. *Id.* at 577, 578, 582–83, 91 S.Ct. 1731.

While the Section 2 (First) duty to "exert every reasonable effort" to make and maintain agreements and to settle disputes is the judicially enforceable "heart" of the RLA, the scope of this obligation is not clearly delineated and has been left to the courts to interpret "on a case-by-case basis." *Id.* at 577, 91 S.Ct. 1731. Northwest contends that the AFA's threatened strike action violates the AFA's Section 2 (First) duties and thus may be enjoined by this Court.

### b. Section 6 of the RLA and the Status Quo

The RLA provides different sets of provisions for resolving different types of disputes. "Minor" disputes, which involve grievances or interpretation of existing agreements, are subject to conference and compulsory arbitration procedures before an adjustment board, while "major" disputes, which involve efforts to form, secure, or change the terms of an agreement, require a lengthy process of bargaining and mediation under the auspices of the NMB. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302–04, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Summit Airlines,* 628 F.2d at 790. Here, because the dispute concerns efforts to change the terms of a collective bargaining agreement, the parties are involved in a major dispute.

■ The RLA creates an "elaborate machinery" for the resolution of major disputes. *Detroit & Toledo*, 396 U.S. at 148–49, 90 S.Ct. 294. This machinery includes notice, 45 U.S.C. §§ 152 (Seventh), 156; negotiation and bargaining, 45 U.S.C. § 152 (Second); mediation by the NMB for an indefinite period of time, 45 U.S.C. § 155 (First); voluntary binding arbitration or in the absence of such arbitration a 30–day "cooling off" period, 45 U.S.C. §§ 155, 157; and the possibility of a Presidential Emergency Board, upon recommendation of the NMB, to be convened during such cooling-off period to seek resolution, followed by another 30–day cooling-off period after the Emergency Board's recommendations, 45 U.S.C. § 160. While these remedies are being exhausted, the RLA imposes upon both parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the "status quo" by resorting to self-help. *See Consol. Rail Corp.*, 491 U.S. at 302, 109 S.Ct. 2477 ("Until they have exhausted those procedures, the parties are obligated to maintain the status quo . . . ."); *Burlington*, 481 U.S. at 445, 107 S.Ct. 1841; *Detroit & Toledo*, 396 U.S. at 148–49, 90 S.Ct. 294.[7] The status quo consists of "actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to this dispute." *Detroit & Toledo*, 396 U.S. at 152, 90 S.Ct. 294. This status quo requirement is found in the three express status quo provisions applicable to each stage, 45 U.S.C. §§ 156,[8] 155 (First),[9] § 160,[10] in combination with the "implicit" status quo requirement of Section 2 (First) " 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce." *Detroit & Toledo*, 396 U.S. at 151, 90 S.Ct. 294. Thus, during these procedures, the parties

---

**7.** As summarized by the Supreme Court:

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 (Second), and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 (First). If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 (First), 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 (Seventh), 5 (First), 6, 10.

*Jacksonville Terminal*, 394 U.S. at 378, 89 S.Ct. 1109; *see Detroit & Toledo*, 396 U.S. at 149 n. 14, 90 S.Ct. 294 (same).

**8.** *See* 45 U.S.C. § 156 (covering period from the first notice of a proposed change up to and through any proceedings before the NMB, and providing that "rates of pay, rules, or working conditions shall not be altered" during this period).

**9.** *See* 45 U.S.C. § 155 (First) (covering period of 30 days following the close of failed NMB proceedings, and providing that "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose," unless the parties agree to arbitration or a Presidential Emergency Board is created during those 30 days).

**10.** *See* 45 U.S.C. § 160 (covering period after the creation of an Emergency Board and for 30 days after such board has made its report to the President, and providing that "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose").

may not engage in self-help. *See Burlington*, 481 U.S. at 445, 107 S.Ct. 1841 ("[T]he RLA requires all parties both 'to exert every reasonable effort to make and maintain' collectively bargained agreements, § 2 First, and to abide by the terms of the most recent collective bargaining agreement until all the settlement procedures have been exhausted, §§ 5, 6, 10."); *Detroit & Toledo*, 396 U.S. at 149–50, 90 S.Ct. 294.

■ As is evident from the preceding summary, the RLA subjects major disputes to "virtually endless 'negotiation, mediation, voluntary arbitration, and conciliation.'" *Burlington*, 481 U.S. at 444–45, 107 S.Ct. 1841 (*quoting Detroit & Toledo*, 396 U.S. at 148–49, 90 S.Ct. 294). These procedures are "'purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.'" *Detroit & Toledo*, 396 U.S. at 149, 90 S.Ct. 294 (*quoting Brotherhood of Ry. & S.S. Clerks v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966)). Exhaustion of these remedies, accordingly, is "an almost interminable process." *Detroit & Toledo*, 396 U.S. at 149, 90 S.Ct. 294. Only after the dispute resolution procedures have been followed and exhausted may the parties engage in self-help. *Burlington*, 481 U.S. at 445, 107 S.Ct. 1841 ("[I]f the parties exhaust these procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute, subject only to such restrictions as may follow from the invocation of an Emergency Board under § 10 of the RLA."); *Jacksonville Terminal*, 394 U.S. at 378–79, 89 S.Ct. 1109 ("Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory

scheme, however, is the ultimate right of the disputants to resort to self-help' the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration.' We have consistently so held in a long line of decisions.") (citations omitted).

In synthesis, three overarching principles emerge from this statutory scheme worth underscoring at this point. First, is the paramount goal of the RLA to resolve labor disputes that threaten to disrupt commerce. *See Burlington*, 481 U.S. at 451, 107 S.Ct. 1841 ("primary goal" of the RLA is "to settle strikes and avoid interruption to commerce"); *Detroit & Toledo*, 396 U.S. at 148, 154, 90 S.Ct. 294. Second, is the exhaustion of the Section 6 procedures to the fullest extent possible before the parties have a right to resort to self help. *See Burlington*, 481 U.S. at 445, 107 S.Ct. 1841; *Detroit & Toledo*, 396 U.S. at 151, 90 S.Ct. 294. And third, is the vital role of the NMB in this process as a neutral third party, but essentially representing the public interest. *See Detroit & Toledo*, 396 U.S. at 149, 90 S.Ct. 294 (noting that a "crucial aspect" of RLA is "the power given to the parties *and the representative of the public* to make the exhaustion of the Act's remedies an almost interminable process") (emphasis added). Again, it is only when the parties have fulfilled their dispute resolution obligations, the NMB has performed its role and these procedures have been exhausted, that in the event the dispute is still not resolved, the parties may resort to self-help. *See Burlington*, 481 U.S. at 445, 107 S.Ct. 1841; *Jacksonville Terminal*, 394 U.S. at 378–79, 89 S.Ct. 1109.

Northwest stresses that there is no dispute that the parties were in the Section 6 process at the time of the § 1113 proceedings. (*See* Appellants' Reply Br., dated Aug. 24, 2006, at 3.) While the AFA does

not expressly state as much in its papers, it has not denied this to be the case, and notes that PFAA and Northwest had been in collective bargaining negotiations since December 2004. (*See* AFA Br. at 2.) Moreover, during the hearing before the Bankruptcy Court, the AFA's general counsel admitted that the AFA has not been released from the NMB procedures. (*See* Tr., Vol. 2, at 15.) However, the AFA contends that by invoking § 1113 of the Bankruptcy Code, Northwest either unilaterally altered the status quo, or terminated the Section 6 major dispute resolution procedures.

### 2. *The Norris–LaGuardia Act*

■ Enacted in 1932, *see* ch. 90, 47 Stat. 70 (1932), the NLGA expresses a " 'basic policy against the injunction of activities of labor unions.' " *Burlington,* 481 U.S. at 437, 107 S.Ct. 1841 (*quoting Street,* 367 U.S. 740 at 772, 81 S.Ct. 1784, 6 L.Ed.2d 1141). It specifically deprives federal courts from exercising jurisdiction to issue "any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter." 29 U.S.C. § 101. "Labor dispute" is broadly defined and includes "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c). Congress made this definition intentionally broad because previous measures attempting to implement a policy against judicial non-intervention in labor disputes had been given " 'unduly limited' " construction by the courts. *See Burlington,* 481 U.S. at 441, 107 S.Ct. 1841 (*quoting Order of R.R. Telegraphers v. Chicago & N.W. Ry. Co.,* 362 U.S. 330, 335–36, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960)). In Section 4 the NLGA lists specific acts that may not be enjoined, including those involving "ceasing or refusing to perform any work." 29 U.S.C. § 104(a).

In enacting the NLGA, Congress "aimed to correct existing abuses of the injunctive remedy in labor disputes." *Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R. Co.,* 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Federal courts had been "drawn into the field" either under the guise of enforcing federal statutes such as the Sherman Act or through diversity of citizenship jurisdiction, where federal courts tended to employ federal law at variance with state labor law concepts. *Id.* Through the NLGA, "Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital." *Id.*

■ Despite the broad swath of the NLGA, the Supreme Court has recognized that the NLGA does not prevent injunctions in certain "limited circumstances," such as to "enjoin[ ] violations of the specific mandate of another labor statute." *Burlington,* 481 U.S. at 444, 107 S.Ct. 1841. The issue before this Court is whether the facts of this case fall into these "limited circumstances."

### 3. *The National Labor Relations Act*

Although the parties here are governed by the statutory scheme set forth in the RLA, the AFA has drawn support for its position from cases involving industries governed by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq. Conversely, Northwest argues that fundamental differences between the RLA and the NLRA make such comparisons inapposite. Such differences, and the effect they have on the outcome of this case, will be examined further below. For now, a few observations are sufficient. First, the NLRA was enacted in 1935, *see* 49 Stat. 449 (1935), *codified as amended* at 29 U.S.C. §§ 151 et seq., and carved out em-

ployers and employees subject to the RLA, *see* 29 U.S.C. § 152(2),(3). Second, the NLRA established employees' right to organize, made such right legally enforceable by requiring employers to bargain collectively with employees, and conferred the right to engage in strikes, picketing, and other concerted activities. *See* Patrick Hardin & John E. Higgins, Jr., *The Developing Labor Law* 27 (4th ed.2001). Of note is that the NLRA, within the industries and labor disputes it encompasses, expressly protects the right of employees to strike. *See* 29 U.S.C. § 157 ("Employees shall have the right to ... engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."); § 163 (stating that except as specifically provided, nothing in the NLRA "shall be construed so as either to interfere with or impede or diminish in any way the right to strike."). To enforce these and other rights and the specific provisions implementing these rights, the NLRA created the National Labor Relations Board ("NLRB"). *See The Developing Labor Law* at 27–28. The NLRA's subsequent history and development is largely not of concern to this case; at issue here is that the RLA, not the NLRA, governs railways and airlines and establishes a lengthy and entirely separate dispute mechanism for those industries.

### 4. *Section 1113 of the Bankruptcy Code*

Addressing the role of a bankruptcy debtor's ability to reject executory contracts, including collective bargaining agreements, the Supreme Court has noted that

> [t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources..... [A] beneficial recapitalization could be jeopardized if the debtor-in-possession were saddled automatically with the debtor's prior collective-bargaining agreement. Thus, the authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.

*NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Accordingly, in *Bildisco,* the Supreme Court upheld the right of a debtor to reject collective bargaining agreements pursuant to 11 U.S.C. § 365(a), subject to certain constraints. *Id.* at 522–23, 525–26, 104 S.Ct. 1188.

Section 1113 of the Bankruptcy Code was passed in 1984 in response to, and less than five months after *Bildisco. See Carey Transp.,* 816 F.2d at 87 (discussing *Bildisco* and passage of § 1113 in response). Section 1113 permits a debtor to petition the Bankruptcy Court for permission to reject its collective bargaining agreements. *See* 11 U.S.C. § 1113(a).[11] However, § 1113 codifies a more stringent standard that a debtor must meet before rejecting such agreements. The AFA has not contended that Northwest has not satisfied these requirements. Nonetheless, explication of these requirements sheds additional light on the extensive adversarial public process that the parties followed preceding the Bankruptcy Court's § 1113

---

**11.** Section 1113 and Section 365(a) exclude railroads but not airlines from their coverage. *See The Railway Labor Act* 498. The origin of this distinction is somewhat convoluted, but ultimately has no bearing on this case. *See id.; see also* Athanassios Papaioannou, *The Duty to Bargain and Rejection of Collective Bargaining Agreements Under Section 1113 by a Bankrupt Airline: Trying to Reconcile R.L.A. with Bankruptcy Code,* 18 Transp. L.J. 219, 223–24 (1990).

Order and bears on the question, discussed below, as to whether Northwest's rejection of its collective bargaining agreements with its flight attendants can reasonably be characterized as "unilateral," "arbitrary," or otherwise unlawful under the RLA.

First, *Bildisco* had held that a debtor could reject its collective bargaining agreements based solely upon a showing that the agreement burdened the estate and that the equities favored rejection. *See Bildisco*, 465 U.S. at 526, 104 S.Ct. 1188; *Carey*, 816 F.2d at 87. Under § 1113, the Bankruptcy Court can approve such an application only upon finding that (1) the debtor has proposed modifications that are "necessary" to permit reorganization and that treat all creditors, the debtor, and all of the affected parties "fairly and equitably"; (2) the authorized representative of the employees has refused to accept such proposal "without good cause"; and (3) the balance of the equities "clearly favors" rejection of such agreement. 11 U.S.C. § 1113(c).

In addition, *Bildisco* had held that the debtor did not have to engage in collective bargaining before modifying or rejecting provisions of the agreement, and that such unilateral actions did not constitute an unfair labor practice in violation of the NLRA. *Bildisco*, 465 U.S. at 532–34, 104 S.Ct. 1188; *see Carey*, 816 F.2d at 87. It reasoned that under § 365(a), from the filing of a bankruptcy petition until formal acceptance, a collective bargaining agreement is not an enforceable contract within the meaning of the NLRA, and therefore an employer did not need to comply with the NLRA's mid-term contract modification procedures. *Id.* at 532, 104 S.Ct. 1188. Section 1113(f) supercedes this part

of *Bildisco* and requires that collective bargaining agreements may not be altered until the Bankruptcy Court approves their rejection.

Moreover, Section 1113 now requires the debtor to first propose these modifications to the union and provide the union information necessary to evaluate the proposal. 11 U.S.C. § 1113(b)(1). The debtor must then "confer in good faith" with the union to attempt to reach "mutually satisfactory modifications." 11 U.S.C. § 1113(b)(2). The Bankruptcy Court must schedule a hearing and all interested parties may be heard. 11 U.S.C. § 1113(d)(1). Only then, and after all the preceding requirements have been satisfied, can the Bankruptcy Court approve an application for rejection of a collective bargaining agreement. 11 U.S.C. § 1113(c).[12]

## B. *LACK OF PRECEDENT HARMONIZING THE STATUTES*

The parties have not pointed the Court to any case, nor has the Court been able to find precedent directly on point, that squarely addresses the intersection of all four statutes in the precise factual posture of these parties. Simply put, "[t]here are no cases resolving the question of whether RLA debtors and the unions representing their employees may exercise economic self-help following rejection of collective bargaining agreement[s]." *The Railway Labor Act* 509. Some cases have addressed the propriety of enjoining a strike in a labor dispute subject to the RLA, despite the restrictions of the NLGA, but not in the context of bankruptcy. *See, e.g., Burlington*, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (concluding that under the NLRA, a federal court did not have juris-

---

**12.** Section 1113(e) also provides for emergency interim relief prior to such rejection if "essential to the continuation of the debtor's business" or to "avoid irreparable damage to the estate." 11 U.S.C. § 1113(e).

diction to enjoin secondary picketing by union in a labor dispute once RLA procedures have been exhausted); *Chicago River*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (confirming district court's power and jurisdiction to issue injunctive orders necessary to enforce compliance with RLA, notwithstanding NLGA). Other cases have addressed the propriety of a bankruptcy court issuing an injunction barring a labor strike, but where the employers and employees were subject to the NLRA, not to the RLA. *See, e.g., Briggs Transp. Co. v. International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 739 F.2d 341 (8th Cir.1984); *In re Petrusch*, 667 F.2d 297 (2d Cir.1981); *Truck Drivers Local Union No. 807, Int'l Bhd. of Teamsters v. Bohack Corp.*, 541 F.2d 312 (2d Cir.1976). As will be discussed below, these cases may implicate a different set of policy concerns than those embodied in the RLA. Still others have hinted, without extensive analysis, at the legality of a strike following a § 1113 rejection of a collective bargaining agreement, but did so in the context of disputes covered by the NLRA, and in any event did not examine the legality of such a strike. *See, e.g., In re Mile Hi Metal Sys. Inc.*, 899 F.2d 887, 893 n. 10 (10th Cir.1990); *In re Royal Composing Room, Inc.*, 62 B.R. 403, 405 (Bankr. S.D.N.Y.1986), *aff'd*, 78 B.R. 671 (S.D.N.Y. 1987), *aff'd*, 848 F.2d 345 (2d Cir.1988). Two cases involved strikes against bankrupt employers under the RLA regime, but did not concern a strike in response to a § 1113 rejection. *See In re Continental Airlines Corp.*, 901 F.2d 1259, 1261 (5th Cir.1990) (analyzing whether striking employees under pre– § 1113 regime were entitled to contract rejection damages); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Eastern Air Lines, Inc.*, 121 B.R. 428 (S.D.N.Y.1990) (holding that bankrupt airline could not enjoin union from striking where airline

did not comply with NLGA's "clean hands" requirement to make every reasonable effort to settle dispute prior to seeking injunction), *aff'd*, 923 F.2d 26 (2d Cir.1991). Finally, others concerned strikes in RLA disputes, but after the Section 6 procedures were exhausted, and the cases did not involve or examine the effect of § 1113. *See, e.g., Jacksonville Terminal*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344; *Pan Am. World Airways v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 894 F.2d 36, 39 (2d Cir.1990) (holding that union was free to strike after exhaustion of RLA procedures and that passage of time did not terminate self-help period).

Whether and how the principles that can be drawn from these cases can guide the Court in the instant case will be examined further below. Nonetheless, this dispute presents, as the Bankruptcy Court observed, an issue of first impression.

C. *WHEN THE RIGHT TO SELF-HELP ACCRUES*

The Court must examine when, under these interrelated statutory schemes, a resort to self-help in a labor dispute subject to the RLA would be allowed.

1. *In General*

■ It is clear that the RLA contemplates a resort to self-help, by either party to a major dispute, once its "virtually endless" bargaining procedures have been exhausted. *See Burlington*, 481 U.S. at 445, 107 S.Ct. 1841 ("[I]f the parties exhaust these procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute...."); *Jacksonville Terminal*, 394 U.S. at 378–79, 89 S.Ct. 1109 ("Implicit in the statutory scheme ... is the ultimate right of the disputants to resort to self-help...."); (citations omitted); *Consol. Rail Corp.*, 491

U.S. at 302–03, 109 S.Ct. 2477 ("Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force.").

It is equally clear that self-help prior to this exhaustion is forbidden by the RLA's status quo provisions and may be enjoined. *See Consol. Rail Corp.,* 491 U.S. at 302–03, 109 S.Ct. 2477 ("Until [the parties] have exhausted those procedures, the parties are obligated to maintain the status quo.... The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures."); *see also Detroit & Toledo,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (affirming issuance of injunction restraining railroad from implementing changes in work conditions prior to exhaustion of Section 6 procedures).

An arguable flip side to the principle that neither party may engage in self-help until the RLA's dispute resolution procedures have been exhausted, and a proposition that the AFA urges, is that if one party makes a unilateral change in the status quo, the Section 6 procedures terminate automatically and the other side is free to engage in self-help. Thus, the AFA argues that "when an employer unilaterally rejects a consensual contract, the union is free to strike." (AFA Br. at 16; *see also id.* at 20, 22.) The AFA relies on *Detroit & Toledo* and *Consolidated Rail Corp.* for this proposition.

A step back to examine this argument for a moment is warranted. To some extent, language in *Detroit & Toledo* suggests that if one side to an RLA labor dispute departs from the status quo, so may the other. In that case, the union had invoked the RLA's status quo provisions, but the railroad refused to maintain the status quo, instead proceeding to make certain disputed changes in work assignments. The Supreme Court commented:

> It could hardly be expected that the union would sit idly by as the railroad rushed to accomplish the very result the union was seeking to prohibit by agreement. The union undoubtedly felt it could resort to self-help if the railroad could, and, not unreasonably, it threatened to strike.

396 U.S. at 154, 90 S.Ct. 294. The Court further remarked that "[i]f the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back its own economic weapons, including the strike. Only if both sides are equally restrained can the Act's remedies work effectively." *Id.* at 155, 90 S.Ct. 294.

This language, however, cannot be viewed in isolation and out of context from the net result of that case. There, the outcome was not that the union was allowed to strike, but that an injunction under the RLA was found appropriate, and that the *railroad* was restrained from changing disputed work conditions. The railroad had also filed a complaint seeking to restrain the union from striking, but that complaint was dismissed and the railroad did not appeal. *Id.* at 147, 90 S.Ct. 294. Thus, the issue of whether the union could engage in self-help once the railroad chose to violate the status quo was not before the Court.[13] Instead, the issue was whether the railroad could engage in certain unilateral action during the status quo, and the Court held that it could not,

---

**13.** Indeed, the Second Circuit characterized as dicta the Supreme Court's language that "[i]t could hardly be expected that the union would sit idly by as the railroad rushed to accomplish the very result the union was seeking to prohibit by agreement." *See Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, ("Atlantic Coast II"),* 125 F.3d 41, 44 (2d Cir.1997).

and that its conduct could thus be enjoined.

The other case cited by the AFA for the principle that once an employer engages in unilateral action, the union is free to strike, is *Consolidated Rail Corp.*, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250. Yet that case simply observed, as the doctrine is stressed above, that *after exhaustion* of the RLA's dispute resolution procedures, the parties may resort to economic force; until exhaustion, consistent with the outcome in *Detroit & Toledo,* the parties are obligated to maintain the status quo, and a status quo violation may be *enjoined. See id.* at 302–03, 310, 109 S.Ct. 2477. The case did not expressly state that violation of the status quo by one party automatically triggers the corresponding ability of the other party to respond in kind. There is a fundamental difference between saying that both sides must be equally restrained, and saying that if one side is not restrained, the other side is also immediately free from restraint. What follows from the principle that "[o]nly if both sides are equally restrained can the Act's remedies work effectively," *Detroit & Toledo,* 396 U.S. at 155, 90 S.Ct. 294, may be that the appropriate remedy in the case of a proven RLA violation is to restrain the non-complying side, not to allow a free-for-all for both sides.

Yet, *United Air Lines, Inc. v. Airline Division, International Brotherhood of Teamsters,* 874 F.2d 110 (2d Cir.1989) suggests that a correlative right to strike arises in response to an employer's unilateral action taken in violation of the RLA. In *United Air Lines,* a newly certified union was allowed to strike where it had complied with its RLA duties, but the employer had rejected the union's overtures to negotiate, thus "disobey[ing] the clear command of the [RLA]." *Id.* at 115; *see Atlantic Coast II,* 125 F.3d at 44 (discussing *United Air Lines*). *United Air Lines* presented a situation different from that in the case at hand, because the parties had not even begun Section 6 dispute resolution procedures. Rather, the case turned on § 152 (Ninth), governing union election and certification. Nonetheless, where the union had complied with its RLA obligations, and the employer under that section had "an absolute duty" to sit down at the bargaining table, the union could not be enjoined from striking. *Id.* at 115.

Language in the RLA's legislative history sheds some light on the question of when and which conduct by an employer may warrant the union's right to strike. Donald Richberg, the labor representative when the proposed RLA legislation was presented to Congress jointly by the railroads and the unions, stated: *"[T]he only thing that can provoke an arbitrary action [referring to strikes] is the power to arbitrarily change the rates of pay or rules of working conditions before the controversy is settled,* and it is provided that they shall not be altered during the entire period of utilization of this law." Hearings on H.R. 7180 before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 93–94 (1926) (emphasis added), *quoted in Detroit & Toledo,* 396 U.S. at 153, 90 S.Ct. 294.[14] While this language suggests that unilateral action by an employer gives the union a right to strike, it is significant in that it specifically qualifies such action as "arbitrary."

Another circumstance that has been held to define the moment when it may be

---

14. Because the RLA resulted from an agreement worked out between management and labor, and then ratified by Congress, statements of the spokesmen for the two parties made during hearings on the proposed Act "are entitled to great weight" in its construction. *Chicago & North Western,* 402 U.S. at 576, 91 S.Ct. 1731.

appropriate to prevent an employer from seeking to enjoin a strike, arises not by operation of the RLA, but by operation of the NLGA's requirement that a party seeking to enjoin its adversary must itself be in compliance with all applicable labor laws. This provision, which sets forth a doctrine of "clean hands," *see Brotherhood of R.R. Trainmen Enter. Lodge, No. 27 v. Toledo Peoria & W. R.R.,* 321 U.S. 50, 66, 64 S.Ct. 413, 88 L.Ed. 534 (1944), states that "[n]o restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. Thus, in *Eastern Air Lines, Inc.,* the district court declined to enjoin a strike against a bankrupt airline where the airline did not have "clean hands"—it had refused to arbitrate after the union had agreed to do so, and thus the employer had not satisfied the NLGA's procedural requirements. *See* 121 B.R. at 436, *aff'd,* 923 F.2d 26 (2d Cir.1991). Although the airline "was within its right to decline to arbitrate" under the RLA, under the NLGA it "then forfeited its right to ask a federal court later for injunctive relief" because the NLGA required it to exert effort to settle by voluntary arbitration before seeking an injunction. *Id.*[15] *See also Rutland Ry. Corp. v. Brotherhood of Locomotive Eng'rs,* 307 F.2d 21, 41 (2d Cir.1962) (remanding for consideration of whether railroad took required steps under RLA before seeking strike injunction; if not, railroad would be barred from injunctive relief by operation of NLGA's clean hands provision).

■■■ Moreover, a right to strike does not arise where an employer acts in a way that technically may be deemed unilateral but actually is permitted by the RLA or has been authorized by operation of law. This principle emerges from the Second Circuit's holdings in the *Atlantic Coast* cases, as well as from *Bildisco.* In *Atlantic Coast I,* the Second Circuit held that in the absence of an initial collective bargaining agreement, an employer was free to make changes in terms and conditions of employment. *See Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, Inc.,* 55 F.3d 90, 93 (2d Cir.1995) ("*Atlantic Coast I*"). In *Atlantic Coast II,* the Circuit Court held that since the employer was legally authorized to make such changes, in the absence of bad faith on the employer's part, the union could not strike in response. 125 F.3d at 43–44. "[I]n the absence of a [collective bargaining agreement], and in the absence of bad faith by the Airline, the concept of fairness alone will not permit the Union to do what it is statutorily prohibited from doing." *Id.* at 44–45. Similarly, in *Bildisco,* the Supreme Court observed that an employer's rejection of its collective bargaining agreement pursuant to the bankruptcy statute could not constitute an unfair labor practice under the NLRA, because such action was not truly "unilateral" but was accomplished "by operation of law." *Bildisco,* 465 U.S. at 533, 104 S.Ct. 1188. *See also Atlantic Coast II,* 125 F.3d at 44 ("The right to strike does not arise in the absence of bad faith. Here, the Airline did what the law permitted it to do.").

■■■ In the final analysis, what the RLA's legislative history and the preceding cases suggest is that under the RLA, a

---

**15.** Although the decision was grounded in the airline's lack of "clean hands," it is additionally worth noting that the union's strike had commenced only after the RLA's dispute resolution procedures had been exhausted. *See id.* at 430–31.

union's right to strike, insofar as it exists, does not accrue until either the exhaustion of the Section 6 procedures, or upon a clear violation by the carrier through a bad faith, arbitrary or otherwise unlawful action; by not complying with the law, the employer does not have clean hands entitling it to injunctive relief to restrain a correlative right of the union to strike. An employer's action taken in compliance with the law does not constitute such arbitrary, unilateral, or unlawful action that could trigger such right on the union's part.

### 2. *In the Bankruptcy Context*

In the bankruptcy context, self-help in the form of implementing changes to terms and conditions of collective bargaining agreements *prior* to authorization by the bankruptcy court under § 1113, is clearly not allowed. *See* 11 U.S.C. § 1113(f) ("No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."); *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 990–91, 992 (2d Cir.1990) (holding that § 1113(f) was intended to prohibit application of any other provision of Bankruptcy Code when such application would permit debtor to achieve unilateral termination or modification of collective bargaining agreement without meeting requirements of § 1113, and therefore that § 1113(f) precludes application of automatic stay when such stay would allow debtor to unilaterally terminate or alter collective bargaining agreement), *cert. denied,* 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991); *see also In re Continental Airlines,* 125 F.3d 120, 137 (3d Cir.1997) (failure to comply with § 1113 bars injunction of arbitration where such injunction would allow employer to escape duty to arbitrate under collective bargaining agreement).

Yet here, Northwest implemented changes after Bankruptcy Court approval.

The Appellees claim that a right to strike accrued the moment the Bankruptcy Court gave Northwest the right to reject its collective bargaining agreement pursuant to § 1113. Under the AFA's theory, either (a) the § 1113 Order brought the parties to the end of the Section 6 process and therefore both parties were released to engage in self-help, or (b) by choosing to implement the § 1113 Order, Northwest violated the status quo provisions imposed by Section 2 (First) and Section 6, and therefore could not enjoin the union from striking. Under either of these theories, at the moment the § 1113 Order was issued, or at the moment Northwest attempted to implement it, the parties were released into self-help and the union was free to strike.

The AFA characterizes Northwest's action as a "unilateral" rejection of the collective bargaining agreement, freeing the union to strike. *See* AFA Br. at 22 ("[T]he threat of a strike in this case came only *after* Northwest had unilaterally rejected the AFA's collective bargaining agreement and imposed terms which had been voted down by four-fifths of the flight attendants."); *id.* at 24 ("Northwest failed to 'maintain' the agreement by rejecting it. A union may strike in response."); *id.* at 25 ("[T]he parties are at a 'stage' in which the employer has unilaterally rejected the collective bargaining agreement, and at that 'stage' the Section 2 (First) duty is not breached by a strike."). Certain of the amici express essentially the same argument:

> The AFA acquired the right to strike at the moment when the Bankruptcy Court rejected the flight attendants' collective bargaining agreement under § 1113(c). At that moment, both Northwest and the AFA stood in the same position they

would have been in had they exhausted the mediation procedures under section 6 of the RLA. Thus, both the employer and the union could resort to self-help. (Brief of Amicus Curiae International Association of Machinists and Aerospace Workers, dated Aug. 23, 2006, at 24.)

The Bankruptcy Court adopted this position, stating that "[i]f there were an apt analogy under the RLA to the action of an employer in instituting new terms and conditions of employment after a § 1113 order, it would be to an employer's unilateral action in changing the status quo that in turn frees the employees to take job action." (Op. at 18.)

In support of its theory, the AFA first argues that employees have engaged in numerous strikes against RLA carriers in bankruptcy without being enjoined. However, each case cited by the AFA did not address the precise situation at issue here: the legality of a strike following a § 1113 rejection. In *In re Continental Airlines*, a bankrupt airline moved to reject its labor contracts pursuant to 11 U.S.C. § 365;[16] that same day, the airline instituted new work rules and the pilot and flight attendant unions called strikes. 901 F.2d at 1260–61. Not only did this fact pattern entail a situation where the employer changed terms and conditions prior to bankruptcy court approval and was thus unilateral in every sense of the word,[17] but the issue of whether the strike was lawful was not before the court; *Continental* concerned whether the employees could receive contract rejection damages and the effect of the strike on those contract rejection damages. *Id.* at 1260, 1265. In *East-*

*ern Air Lines*, the employer had failed to comply with the NLGA's "clean hands" provision by refusing to arbitrate prior to seeking an injunction. *See* 121 B.R. at 436. In *In re Penn Central Transp.*, 458 F.Supp. 1234 (E.D.Pa.1978), the parties had reached exhaustion of the RLA's remedies. *See id.* at 1249 n. 9, 1252.

The AFA also relies on cases arising under the NLRA for its contention that if an employer acts unilaterally by rejecting a collective bargaining agreement through a § 1113 proceeding, the union is free to strike. The Court notes at the outset that many of these cases do not address the legality of a strike but instead assess whether a § 1113 rejection is appropriate; each merely assumes that a strike could occur following that rejection. *See, e.g., In re Mile Hi Metal Sys. Inc.*, 899 F.2d at 893 n. 10 ("Another safeguard against [the debtor] overreaching [when proposing modifications to a collective bargaining agreement] is the fact that rejection of a collective bargaining agreement could give rise to a strike or other labor action which would actually decrease the likelihood of a successful reorganization."); *In re Royal Composing Room, Inc.*, 62 B.R. at 405 (observing, in considering whether to grant rejection of collective bargaining agreement under § 1113, that "[t]he Union made it clear that the workers would in all likelihood strike if rejection were permitted, which strike alone could force the Debtor to close permanently"), *aff'd,* 78 B.R. 671 (S.D.N.Y.1987), *aff'd,* 848 F.2d 345 (2d Cir.1988); *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 806 (Bankr. W.D.Ky.1985) (stating that following

---

**16.** Because the bankruptcy petition was filed prior to the enactment of § 1113, the employer's ability to reject its contracts was governed by § 365 and that part of *Bildisco* that was ultimately superseded by § 1113. *See Continental,* 901 F.2d at 1266 n. 6.

**17.** However, under pre– § 1113 law, the airline's rejection of the collective bargaining agreement involved no statutory violation and the collective bargaining agreements were unenforceable from the time of the bankruptcy filing. *Id.* at 1266.

§ 1113 rejection "the employees retain the right to strike as their ultimate bargaining tool").

The Second Circuit case relied upon by the AFA, *Truck Drivers Local 807 v. Carey Transportation,* does not hold that a union may strike following a § 1113 rejection. Rather, it holds that one of the equitable considerations in considering whether to reject a collective bargaining agreement under § 1113 is the likelihood and consequences of a strike if the bargaining agreement is voided. *See* 816 F.2d at 93. This situation poses a different question from whether a strike would be legal. A strike may be more likely in some circumstances than others, for instance if the parties have reached the end of their bargaining process. Moreover, because of the essential role of the NMB in maintaining the parties in negotiations, a strike might be more likely in an NLRA context than in an RLA context, where there is no intermediary so closely involved.

More importantly, each of the preceding cases, as well as others brought to the Court's attention, arose under the NLRA, rather than the RLA. The Bankruptcy Court so noted, and for this reason did not rely on those cases. This distinction, as will be elaborated below, is fundamental.

▮ Thus, no statutory or case law authority explicitly holds that the effect of the rejection of a collective bargaining agreement pursuant to § 1113 in an RLA case, where there is no evidence of arbitrariness, bad faith, or other unlawful act on the carrier's part, is to automatically terminate the Section 6 process at the instance of the union and immediately give the union the right to strike, and correspondingly, the carrier to engage in self-help.

In this vacuum, the Bankruptcy Court assumed that the NLGA governs to bar an injunction and set the parties loose to resort to self-help. Yet this conclusion cannot hold. This Court is not persuaded that a debtor's actions pursuant to the process created by Congress itself in § 1113 and intended to enable an insolvent to remain in reorganization, are taken in bad faith, "arbitrary," nor, by definition, unlawful. First, the AFA's proposition would place the determination of when the parties are released to engage in self-help not in the hands of the NMB, but, as suggested by Appellants, in the hands of the bankruptcy judge. Second, it creates a conflict between RLA Section 6 and § 1113 that leads to anomalous results. Third, it does not sufficiently take into account the fundamental policy concerns and purposes of the RLA, nor of § 1113 in the context of an insolvent carrier.

### a. Curtailing the Role of the NMB

The statutory scheme makes clear the central role of the NMB in the resolution of major disputes. If a dispute over changes in rates of pay, rules, or working conditions has not been resolved through conference, either party or both parties to the dispute may invoke the NMB's services; and the NMB may itself proffer its services if it finds that a labor emergency exists. 45 U.S.C. § 155. The NMB is then directed to use its "best efforts" to resolve the dispute through mediation. *Id.* If such efforts are unsuccessful, the NMB is required to induce the parties to submit the controversy to arbitration. *Id.* If arbitration is declined, the NMB must notify both parties in writing that its efforts have failed. *Id.* Then, for 30 days after, unless in the intervening period the parties agree to arbitration (or an emergency board is created by the President at the NMB's recommendation pursuant to § 160), "no change shall be made in the rates of pay, rules, or working conditions or established

practices in effect prior to the time the dispute arose." *Id.* Section 160 allows for the NMB to further prolong the process by giving it authority to notify the President, who then has discretion to create an emergency board, if in the NMB's judgment the dispute threatens substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service. 45 U.S.C. § 160.

While the parties are before the NMB, only after the NMB's efforts are unsuccessful does the next step in the process—proffer of arbitration—come to pass. 45 U.S.C. § 155 ("If such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final *required action* ... to induce the parties to submit their controversy to arbitration.") (emphasis added). In the meantime, because the Section 6 procedure has been invoked, the parties are bound by the status quo. *See* 45 U.S.C. § 156. Moreover, this status quo provision makes clear that once the services of the NMB have been invoked, the status quo may not be changed until the NMB itself has acted. *See id.* ("In every case where ... the services of the Mediation Board have been requested by either party or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier *until the controversy has finally been acted upon,* as required by section 155 of this title, *by the Mediation Board,* unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.") (emphasis added); *see Local 808, Building Maint., Serv. & R.R. Workers v. Nat'l Mediation Bd.,* 888 F.2d 1428, 1432 (D.C.Cir.1990) ("[I]t is only *after the Board has proffered arbitration* and a party has waited the requisite thirty day cooling-off

period (or sixty days in the event an Emergency Board has been created by the President), that a party may engage in self-help.") (emphasis added).

Significantly, the statute contains no time limit for mediation under the NMB's watch. *See Local 808,* 888 F.2d at 1438 (noting statute's lack of time limit for mediation); *see also Burlington,* 481 U.S. at 444–45, 107 S.Ct. 1841 (describing process as "virtually endless"); *Detroit & Toledo,* 396 U.S. at 149, 90 S.Ct. 294 (describing process as "almost interminable"). Nor does the RLA contain any mechanism for either party, on its own initiative, to terminate mediation proceedings before the NMB. This statutory framework thus suggests that whether the Section 6 dispute resolution procedures may come to an end is left in the hands of the NMB, and not of the parties.

That this power to almost indefinitely prolong the process rests with the NMB is no accident. A "crucial aspect" of the RLA is "the power given to the parties *and the representative of the public* to make the exhaustion of the Act's remedies an almost interminable process." *Detroit & Toledo,* 396 U.S. at 149, 90 S.Ct. 294 (emphasis added). The NMB's power to hold a dispute in mediation "is the key to the structure Congress established for bringing about settlements without industrial strife." *Local 808,* 888 F.2d at 1432; *see International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Nat'l Mediation Bd.,* 930 F.2d 45, 47 (D.C.Cir. 1991) ("[T]he real 'key' is the Board's authority to hold the parties to a dispute in mediation so they cannot engage in self-help; it is 'a coercive tool essential to bringing the parties to conciliation.'") (*quoting Local 808,* 888 F.2d at 1432, 1438); *see also American Train Dispatchers Dep't v. Fort Smith R.R. Co.,* 121 F.3d 267, 271 (7th Cir.1997) (describing the

NMB's "ability to force continuing negotiations almost interminably" as its "primary resource").

Courts have recognized this vital role for the NMB by refusing to review the Board's decision to keep a dispute in mediation "[a]bsent a showing of patent official bad faith." *Local 808,* 888 F.2d at 1434 (reversing district court's order directing NMB to terminate mediation and proffer arbitration); *see International Ass'n of Machinists and Aerospace Workers v. Nat'l Mediation Bd.,* 180 F.Supp.2d 188, 191 (D.D.C.2002) ("[B]ecause the NMB's power to prolong negotiations can be used to exert pressure on the parties to settle, a court should exercise the 'utmost restraint before . . . terminat[ing] a process that has not been terminated by a public agency.'") (*quoting International Ass'n of Machinists & Aerospace Workers v. National Mediation Bd.,* 425 F.2d 527, 537 (D.C.Cir. 1970)); *see also International Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.,* 374 F.Supp.2d 135, 140–41 (D.D.C.2005) (denying preliminary injunction which had sought to compel NMB to terminate mediation and proffer arbitration; that mediation had lasted for four years did not demonstrate that NMB was patently unreasonable, because the "NMB's power to hold the parties in mediation is an important tool to bringing the parties to conciliation"); *Seaboard World Airways, Inc. v. Local 851, Int'l Bhd. of Teamsters,* 501 F.Supp. 47 (E.D.N.Y.1980) (following *Machinists,* 425 F.2d 527, and denying union's request for an order directing the NMB to declare an impasse and either proffer arbitration or release the parties from mediation). Indeed, "[t]he judicial power of review over NMB decisions is so limited that the few district courts that have ordered the NMB to terminate mediation and proffer arbitration have been overturned on appeal." *Machinists,* 374 F.Supp.2d at 140 n. 4.

The implications of these principles are crucial: Section 6 structures a *tripartite* process in which the NMB plays a vital and unique third-party role, accorded the power, as a neutral representative of the public interest, to set the timing for the parties' negotiation, monitor each stage, invoke the next stage of the status quo, and determine the longevity of the procedure and thus when the status quo may end. The effect of the Bankruptcy Court's holding and of the AFA's theory is to prematurely curtail this role in the case of an insolvent carrier which is already in the Section 6 process and which applies for § 1113 relief to remain in operation during reorganization, thus to place the determination of when the parties have exhausted the Section 6 procedures either in the hands of the Bankruptcy Court by issuing a § 1113 order, or in the hands of the carrier in implementing the § 1113 order, or in the hands of the union by determining on its own initiative that by the issuance of the § 1113 order alone the process has come to an end. Any of these prospects effectively eliminates the NMB's role as a neutral determinant of the timing of when the Section 6 process should properly end, taking into account not only the interests of the parties, but of the public, as well as what additional measures within its power the NMB may take to avert self-help that could disrupt commerce. In this respect, enabling the AFA by itself to halt the Section 6 procedures and launch a strike would effectively deprive the NMB of its ability to fulfill its statutory function to the fullest extent possible, and thus vitiates a crucial part of the RLA's structure, process, and remedies.

### b. Creation of Conflicts between § 1113 and RLA

The position urged by the AFA and reflected in the Bankruptcy Court's ruling,

is untenable as well because rather than harmonizing § 1113 and the RLA, it creates conflict between these statutory schemes, resulting in several anomalies.

First, the effect of the Bankruptcy Court's ruling is that by availing itself of the remedial procedures Congress authorized in § 1113, an insolvent carrier in reorganization would be deemed to have violated its Section 6 obligations—even though the debtor did what the law permitted it to do.[18] No party here disputes that a court may enjoin Section 6 violations. *See Consol. Rail Corp.*, 491 U.S. at 302–03, 109 S.Ct. 2477 ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures."); *Burlington*, 481 U.S. at 445 n. 11, 107 S.Ct. 1841 ("[F]ederal courts [can] enjoin parties to adhere to the status quo requirement embodied in the specific language of §§ 5, 6, and 10 of the RLA."); *Detroit & Toledo*, 396 U.S. at 155, 90 S.Ct. 294. Under this principle, if the very act of an insolvent carrier resorting to § 1113 amounted to a Section 6 violation, theoretically the Court would be able to enjoin that debtor from carrying out a § 1113 order duly granted.

Appellants have not argued that this course of action would be appropriate, and indeed it would produce a bizarre result that manifestly Congress could not have envisioned.

As already noted above, the Supreme Court determined in *Bildisco* that "[I]n a Chapter 11 case, ... the 'modification' in the agreement has been accomplished not by the employer's unilateral action, but rather by operation of law." 465 U.S. at 533, 104 S.Ct. 1188. For that reason, the Court concluded that a debtor had not violated its NLRA obligations and had not committed an unfair labor practice by modifying its collective bargaining agreements pursuant to bankruptcy code procedures.[19] The same principle guided the Second Circuit's remark in *Atlantic Coast II* that "[h]ere, the Airline did what the law permitted it to do." 125 F.3d at 44. By the same token, in this case, Northwest acted lawfully, with express statutory and judicial authorization in altering the status quo pursuant to § 1113. In fact, the Bankruptcy Court specifically remarked that under the circumstances of this case, it could not be said that "the Debtors acted in bad faith when they imposed the terms

---

**18.** Alternatively, by invoking § 1113, the debtor would be deemed to have brought the Section 6 process automatically to an end. Yet, as discussed above, by the explicit terms of the RLA that determination was entrusted by Congress to the NMB, not the debtor. Nor is it clear that Congress intended § 1113 to terminate the Section 6 process. In addition, the AFA does not argue that the § 1113 process terminates the status quo, freeing the union to strike. Here, the parties continued to participate in Section 6 mediation even while the § 1113 procedure was ongoing. It does not make sense to conclude that the debtor does not violate its RLA duties by filing for rejection of a collective bargaining agreement under § 1113, but then, after the § 1113 process is completed, by putting into effect the approval granted in the § 1113 process, the debtor has violated those same duties.

**19.** The Supreme Court held that from the filing of a bankruptcy petition until formal acceptance, a collective bargaining agreement is not an enforceable contract within the meaning of the NLRA, and therefore the employer did not need to comply with the NLRA's mid-term contract modification procedures. *Id.* at 532, 104 S.Ct. 1188. This part of *Bildisco* has been superceded by statute, as § 1113(7) requires that collective bargaining agreements may not be altered until the Bankruptcy Court approves their rejection. Although *Bildisco's* particular legal requirements for rejection of a collective bargaining agreement in bankruptcy were changed with the enactment of § 1113, the principle that compliance with such legal requirements cannot be deemed a violation of another labor statute's requirements is still sound.

and conditions of the March 1 Agreement." (Op. at 17.) In consequence, Northwest's action could not be deemed to have been arbitrary, taken in bad faith, impermissibly unilateral or otherwise unlawful sufficient to comprise a violation of Section 6.[20]

Moreover, to hold that the operation of § 1113 triggers self-help by the union not only undermines the RLA's purpose of preventing strikes, but undercuts the Bankruptcy Code's purpose of allowing a debtor to operate, provide services, and attract investments in favor of reorganization. "[T]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Bildisco*, 465 U.S. at 528, 104 S.Ct. 1188. Allowing an insolvent carrier to suffer a strike because it has implemented contract modifications under the authority of the bankruptcy court, that are determined to be necessary to the carrier's reorganization, undercuts the purposes of both the RLA and the Bankruptcy Code.

A construction of § 1113 that releases a union to strike the moment a carrier in reorganization seeks to give effect to a § 1113 order creates unjustifiable differences in treatment between solvent and insolvent carriers in Section 6 proceedings. While a solvent carrier theoretically can endure the almost interminable Section 6 process without altering the status quo, the insolvent carrier may not be able to do so. RLA negotiating procedures "assume that the carrier involved is viable and will be able to meet its payroll and contractual obligations to employees and other credi-

tors." *Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Employees, AFL–CIO v. REA Express, Inc.*, 523 F.2d 164, 169 (2d Cir.1975). Indeed, § 1113 effectively provides the means for the insolvent to continue to operate and prevent interruption of commerce, to that extent advancing the purposes of the RLA. As the Second Circuit reasoned in *REA Express*, a pre– § 1113 case:

> Unless the debtor-in-possession is permitted to act promptly, albeit unilaterally, in avoiding onerous employment terms that will prevent it from continuing as a going concern, the enterprise, and with it the employment of its workers, may fail. Although a solvent employer might be able to survive continuation of the status quo pending the protected negotiations, including arbitration and mediation as provided for by § 6 of the RLA, a trustee or debtor-in-possession in charge of a carrier teetering on the brink of disaster would, if saddled by onerous executory terms of its predecessor's agreements, not be able to continue in business that long.

*Id.* at 170–71. It was for these reasons that the Second Circuit was persuaded that an RLA carrier in bankruptcy could reject its collective bargaining agreements, as long as the bankruptcy court found those agreements sufficiently onerous and burdensome to warrant rejection. *Id.* at 171–72. The consequence of not allowing rejection of a collective bargaining agreement, the Second Circuit stated, "would ultimately be to defeat the purpose of the

---

**20.** The Court recognizes that the Eighth Circuit has concluded that merely because *Bildisco* held that a contract may be lawfully abrogated in Chapter 11 and that such abrogation was not an unfair labor practice did not mandate that the bankruptcy court was

conferred jurisdiction to enjoin a strike in response to such abrogation. *See Briggs*, 739 F.2d at 344. However, that case arose under the NLRA and thus did not involve a carrier subject to the RLA negotiating procedures.

RLA itself, which is to avoid disruption of commerce by insuring that the carrier will continue operations pending resolution of labor disputes, since the end result could well be to preclude financial reorganization of the carrier and thus lead to its demise. There then would simply be no operations left to disrupt." *Id.* at 169.

To be sure, the decisions holding that § 1113 rejections of collective bargaining agreements of NLRA employers leave the employees free to strike presumably create the same difference in potential consequences, between solvent and insolvent NLRA debtors. However, in the RLA Congress explicitly chose to carve out interstate carriers and to subject them to an entirely different statutory scheme. Congress has unequivocally indicated that it does not want this particular industry disrupted by labor strife and legislated a scheme designed to *prevent* strikes, unlike that underlying NLRA disputes that expressly protects the right to strike. *See* 29 U.S.C. § 157 (granting right to engage in concerted activities for collective bargaining "or other mutual aid or protection"), § 163 (cautioning that except as otherwise specifically provided, nothing in the NLRA shall be construed to "interfere with or impede or diminish in any way the right to strike"). As noted in *Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), where labor disputes relate to industries covered by the RLA, "[m]ore is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern." *Id.* at 552, 57 S.Ct. 592. Furthermore, for the RLA debtor not to invoke the § 1113 remedy could be more onerous than it would be to the NLRA debtor, since the process

for changing terms and conditions of employment in the RLA context is otherwise "almost interminable." *Detroit & Toledo*, 396 U.S. at 149, 90 S.Ct. 294.

The AFA overstates the case when it asserts that at the end of the major dispute resolution procedures of Section 6, both sides are *equally* free to engage in economic self-help, because this does not hold in the context of an insolvent carrier. An insolvent carrier involved in Section 6 procedures not only remains obligated to continue in the process even after invoking § 1113, but during the course of reorganization may not have an unfettered ability to engage in all forms of self-help without continuing bankruptcy court supervision and approval of measures that might substantially impair the value of the estate and the interests of other creditors. "[T]he debtor, though left in possession ... does not operate ... as it did before the filing of the petition, unfettered and without restraint." *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 125–26, 60 S.Ct. 1, 84 L.Ed. 110 (1939). The debtor-in-possession is a fiduciary, obligated to maximize the value of the estate, treat all parties to the case fairly, and protect and conserve the debtor's property. *See In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005); *In re Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr.S.D.N.Y.1998); *In re Penick Pharm., Inc.*, 227 B.R. 229, 232–33 (Bankr.S.D.N.Y.1998). Creditor and equity committees can investigate the debtor's past and current operations, oversee continuing operations, and negotiate with the debtor concerning a reorganization plan. *See* 11 U.S.C. § 1103 (providing creditor and equity committees with power to investigate the past and current operations and financial conditions, desirability of the continuance of such business, and any oth-

er matters relevant to the case or formulation of a reorganization plan).

Although ordinary business decisions of a debtor-in-possession do not have as much judicial oversight, *see* 11 U.S.C. § 363(c)(1) (transactions in ordinary course of business do not require notice and hearing), creditors and other parties in interest are given the power to be heard when transactions are out of the ordinary and could materially affect their interests, and the debtor's actions are subject to bankruptcy court oversight. *See, e.g.,* 11 U.S.C. § 363(b) (transactions outside ordinary course of business require notice and a hearing); 11 U.S.C. § 365(a) (court approval required before assuming or rejecting an executory contract or unexpired lease of real property); 11 U.S.C. § 364(b)—(d) (permission required before obtaining certain credit or debt other than in the ordinary course of business or on a secured or superpriority basis). Thus, upon purported release into self-help, an RLA employer that is in a Chapter 11 reorganization proceeding as debtor-in-possession does not have unrestricted ability to employ all the tools of self-help ordinarily available to solvent companies.[21]

In sum, the Bankruptcy Court's ruling renders § 1113 not a statutory remedy to a carrier in reorganization, but a suicide weapon. It presents the bankrupt carrier with an untenable choice. It can elect to avail itself of § 1113 relief. However, if it succeeds—which success entails demonstrating that rejection of its collective bargaining agreements is "necessary" to the carrier's reorganization, that the union did not have "good cause" to reject the proposal made in the course of the § 1113 proceeding, and that the equities clearly favored rejection of the collective bargaining agreement—it nonetheless could not implement the court-authorized contract rejection without automatically providing the union permissible grounds to trigger a strike that could lead to the carrier's demise in liquidation, ironically the very financial threat which constituted the reason for the carrier seeking the § 1113 rejection in the first place. Alternatively, the carrier can refrain from proceeding under § 1113 and continue under the almost interminable process of Section 6 until its financial burdens and the length of the process eventually threaten its existence, and thereby risk disruption to commerce, even though obtaining sooner relief under § 1113 may be necessary to its successful reorganization and to avoid potential disruption of commerce.

### c. Accounting for Differences Between the NLRA and the RLA

The AFA argues that the fact that the cases it relies on arise under the NLRA rather than the RLA makes no difference, and that in fact, the right to strike is greater under the RLA than under the NLRA.

■ Because of fundamental differences in the purposes and schemes of these statutes, parallels between the two laws must be drawn with care. Although the NLRA "may provide useful analogies for interpreting the RLA," it " 'cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes.' " *Trans World Airlines, Inc.*

---

**21.** For this reason, Northwest may also overstate the case when it asserts that if the Section 6 process were truly exhausted, it would be free to impose any terms and conditions previously subject to bargaining. To the extent that its self-help efforts implicate the restraints imposed by the Bankruptcy Code, including the terms and conditions embodied in the § 1113 Order, its ability to implement such self-help may be limited.

*v. Independent Fed'n of Flight Attendants,* 489 U.S. 426, 439, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) (*quoting Jacksonville Terminal,* 394 U.S. at 383, 89 S.Ct. 1109); *see also Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 80, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) ("National Labor Relations Act cases are not necessarily controlling in situations, such as this one, which are governed by the Railway Labor Act."); *Chicago & North Western,* 402 U.S. at 579 n. 11, 91 S.Ct. 1731 ("[P]arallels between the [NLRA's] duty to bargain in good faith and the [RLA's] duty to exert every reasonable effort, like *all* parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes.") (emphasis added). "The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are not the same as those which form the basis of the National Labor Relations Act." *Chicago River,* 353 U.S. at 31 n. 2, 77 S.Ct. 635.

As indicated earlier, the RLA was passed in 1926, and amended in 1934. *See id.* at 35, 77 S.Ct. 635. The NLRA was enacted in 1935. *See* 49 Stat. 449 (1935), *codified as amended* at 29 U.S.C. §§ 151 et seq. Thus, the RLA was passed first; yet rather than adding additional industries to the RLA's framework, Congress created a separate statutory scheme for those industries, the NLRA, and expressly carved out employers and employees subject to the RLA from its coverage. *See* 29 U.S.C. § 152(2),(3). Congress thereby signaled its intent to treat railroads (and later airlines, by amending the RLA in 1936 to bring airlines within its scope) differently than other industries. Thus, through the RLA Congress placed the railroad and airline industries in a unique statutory framework, different from that prevailing in any other industry. As Supreme Court Justice Felix Frankfurter observed in 1945: "From the point of view of industrial relations our railroads are largely a thing apart .... 'The railroad world is like a state within a state.'..." *Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 751, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting).

One of these fundamental differences in treatment implicates when the right to strike accrues. This distinction is reflected in the statutory scheme. The NLRA expressly protects the right to strike, stating that "[e]mployees shall have the right to ... engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Additionally, it states that except as specifically provided, nothing in the NLRA "shall be construed so as either to interfere with or impede or diminish in any way the right to strike." 29 U.S.C. § 163. In contrast, the RLA contains no such express provisions and, while not removing a union's right to strike once its procedures are exhausted, imposes an elaborate, almost interminable process before such right to strike accrues.

This statutory language reflects different policies behind each statute. In the NLRA context, the Supreme Court observed that " 'there is no general federal anti-strike policy.' " *Buffalo Forge Co. v. United Steelworkers of Am., AFL–CIO,* 428 U.S. 397, 409, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) (*quoting Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 225, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) (dissent)). Thus, in a suit under § 301 of the Labor Management Relations Act to enjoin a strike, where the strike was a breach of a private contract but "d[id] not threaten any additional public policy," "the

anti-injunction policy of Norris–LaGuardia should prevail." *Id.*

In the context of the railroad and airline industry, however, there *is* precisely such an anti-strike policy, embodied in the RLA. *See Burlington,* 481 U.S. at 451, 107 S.Ct. 1841 ("primary goal" of the RLA is "to settle strikes and avoid interruption to commerce"); *Detroit & Toledo,* 396 U.S. at 148, 90 S.Ct. 294 (RLA passed "to prevent, if possible, wasteful strikes and interruptions of interstate commerce"); *id.* at 154, 90 S.Ct. 294 (RLA's "primary objective" is "prevention of strikes"); *Texas & New Orleans R.R. Co.,* 281 U.S. at 565, 50 S.Ct. 427 ("the major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes' "). The case now before this Court is therefore not one in which a strike would "not threaten any additional public policy." *Buffalo Forge,* 428 U.S. at 409, 96 S.Ct. 3141; *cf. Long Island R.R. v. Int'l Ass'n of Machinists,* 874 F.2d 901, 909 (2d Cir. 1989) (noting that *Buffalo Forge* was decided under the NLRA, under which "there is no general federal anti-strike policy," whereas since the "major purpose" of the RLA was to prevent strikes in the transportation industries subject to its governance, *Buffalo Forge* is "inapposite") (quotations omitted).

 While the NLRA also is concerned with promoting "industrial peace," *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893 (1937) and avoiding "industrial strife which interfere with the normal flow of commerce," 29 U.S.C. § 141, it is not concerned with increasing stability in the carrier industry. The NLRA therefore does not limit disruption in certain industries by preventing strikes through channeling all disputes into an almost interminable dispute resolution procedure of arbitration and mediation. That is the purview of the RLA. The RLA, unlike the NLRA, is designed and intended to avoid disruption to the operation of carriers. *See Summit Airlines,* 628 F.2d 787, 794–95 (2d Cir. 1980) ("Unlike the National Labor Relations Act, the Railway Labor Act is specifically designed and intended '(t)o avoid any interruption to commerce or to the operation of any carrier engaged therein . . . .' ") (quoting 45 U.S.C. § 151a).

 Because the NLRA expressly protects the right to strike, any prohibition on striking arises from contract; when that contract is rejected under § 1113, that prohibition is removed and, arguably, the employees may be permitted to strike. As one treatise explains: "If a debtor subject to the NLRA rejects its collective bargaining agreement, any express or implied no-strike provision may no longer be in effect, thus eliminating any basis for the debtor to enjoin a strike." *The Railway Labor Act* 509. *See also* 2 N. Peter Lareau, *Labor and Employment Law* § 42.03[3] (2006) ("[T]he rejection itself arguably releases the union from *any no-strike clause* and permits the parties to utilize the same economic weapons to which they would be entitled at the expiration of any collective bargaining agreement.") (emphasis added). In contrast, in the RLA context, the prohibition on striking does not arise from a clause in the collective bargaining agreement, but from the underlying policy of RLA itself to prevent strikes that could disrupt commerce. Under the RLA, the status quo remains upon expiration of a collective bargaining agreement and the parties must negotiate for change pursuant to its procedures.

Appellants' contention that the breadth of the right to strike is greater under the RLA than the NLRA does not take into account that under the RLA, this broader range of self-help is authorized only once the RLA's dispute resolution procedures

are *exhausted. See Trans World Airlines,* 489 U.S. at 439, 109 S.Ct. 1225 (noting that its cases "have read the RLA to provide greater avenues of self-help *to parties that have exhausted* the statute's 'virtually endless' dispute resolution mechanisms than would be available under the NLRA") (citation omitted) (emphasis added). A broader scope of self-help after exhaustion does not speak to the availability of self-help while the parties are still in the midst of the RLA's Section 6 dispute resolution procedures.

The RLA's fundamental concern with preventing disruption to the transportation industry by channeling all major disputes into a drawn-out bargaining and mediation process, distinguishes it from the NRLA and makes cases decided under the latter statute distinguishable.

## D. *HARMONIZING THE STATUTES*

 The Court is faced with a situation in which it "ha[s] no choice but to trace out as best [it] may the uncertain line of appropriate accommodation" of three (or even four) statutes "with purposes that lead in opposing directions." *Chicago & North Western,* 402 U.S. at 582, 91 S.Ct. 1731. It is the duty of this Court to harmonize these overlapping statutes to give effect to each one insofar as they are capable of co-existence and to preserve the sense and purpose of each, insofar as they are not manifestly incompatible. "When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *F.C.C. v. NextWave Personal Commc'ns Inc.,* 537 U.S. 293, 304, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003). Where two statutes conflict, a court must "give effect to both statutes to the extent that they are not mutually repugnant." *REA Express,* 523 F.2d at 169.

 "In determining the meaning of a statute, courts must look not only to the particular statutory language, but also to the design of the statute as a whole and to its object and policy." *Johnson v. United States,* 123 F.3d 700, 702–03 (2d Cir. 1997) (*citing Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990)). "It is of course appropriate to construe a particular provision of an Act in light of the Act's structure and purpose." *Burlington,* 481 U.S. at 451 n. 15, 107 S.Ct. 1841.

1. *Accommodating the NLGA to the RLA*

 In harmonizing the RLA and the NLGA, the Supreme Court has repeatedly found that the NLGA "does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Chicago & North Western,* 402 U.S. at 581, 91 S.Ct. 1731. Thus,

> [t]o accommodate the competing demands of the RLA and the Norris–LaGuardia Act, our cases establish that the Norris–LaGuardia Act "does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act."

*Burlington,* 481 U.S. at 445, 107 S.Ct. 1841 (*quoting Street,* 367 U.S. at 772–73, 81 S.Ct. 1784). *See Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 513, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) ("[T]he NLGA § 4 general limitation on district courts' power to issue injunctions in labor disputes must be accommodated to the more specific provisions of the RLA."); *Brotherhood of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.,* 373 U.S. 33, 39, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963) (where strike would violate RLA provisions for resolving grievances over monetary awards, "the more

generalized provisions of the Norris–La-Guardia Act" "required accommodating" and strike could be enjoined); *Chicago River,* 353 U.S. at 41–42, 77 S.Ct. 635 ("[T]he specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris–LaGuardia Act."); *Brotherhood of R.R. Trainmen v. Howard,* 343 U.S. 768, 774–75, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952) ("[T]he District Court has jurisdiction and power to issue necessary injunctive orders notwithstanding the provisions of the Norris–LaGuardia Act."); *Graham v. Brotherhood of Locomotive Firemen & Enginemen,* 338 U.S. 232, 237, 70 S.Ct. 14, 94 L.Ed. 22 (1949) (NLGA "did not deprive federal courts of jurisdiction to compel compliance with positive mandates of the Railway Labor Act"); *Virginian Ry. Co.,* 300 U.S. at 563, 57 S.Ct. 592 (where union obtained order enjoining railroad to recognize union, as required by RLA, the NLGA "can affect the present decree only so far as its provisions are found not to conflict with those of [the relevant RLA provisions], authorizing the relief which has been granted. Such provisions cannot be rendered nugatory by the earlier and more general provisions of the NLGA."); *see also Chicago & North Western,* 402 U.S. at 582 n. 17, 91 S.Ct. 1731 (noting that Congressional debates over the NLGA support a construction of that Act permitting federal courts to enjoin strikes in violation of the RLA in appropriate cases).

▬▬▬ It is true that the policy of the NLGA suggests that the courts "should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effec-tively guard the plaintiff's right." *Street,* 367 U.S. at 773, 81 S.Ct. 1784.[22] However, it is also clear that "the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris–LaGuardia Act." *Chicago River,* 353 U.S. at 42, 77 S.Ct. 635. Thus, where there is a clear violation of the RLA's provisions, the Court has jurisdiction to compel compliance with those provisions. The Supreme Court "has authorized the use of injunctive relief to vindicate the processes of the Railway Labor Act." *Id.* at 41, 77 S.Ct. 635; *see also id.* at 42, 77 S.Ct. 635 (a district court " 'has jurisdiction and power to issue necessary injunctive orders [to enforce compliance with the requirements of the Railway Labor Act] notwithstanding the provisions of the NLGA.' ") (*quoting Howard,* 343 U.S. at 774, 72 S.Ct. 1022).

For this reason, *In re Petrusch,* a case involving an NLRA employer, is inapt. There, the Second Circuit held that the bankruptcy law's automatic stay provisions did not supercede the NLGA, and thus that the NLGA prohibited the Bankruptcy Court from enjoining a labor union from picketing a debtor's business, where such picketing related to a labor dispute (over whether the debtor was required to make payments to the union's health and hospital and retirement funds). Noting that the Bankruptcy Reform Act's legislative history contained no reference to the NLGA, it concluded that this omission was "self-evident proof that Congress never intended to supersede or transcend [the NLGA], since we cannot believe the NLGA was to be superceded, sub silentio." 667 F.2d at

---

**22.** In *Street,* the Supreme Court construed the RLA to prohibit a union from using exacted funds, over an employee's objection, to support political causes opposed by the employee. *Id.* at 768–69, 81 S.Ct. 1784. It remanded for consideration of remedies, but cautioned that a blanket injunction would not be allowed because reasonable alternatives existed, and a blanket injunction implicated First Amendment concerns, making a more limited injunction appropriate. *Id.* at 772–73, 81 S.Ct. 1784.

300. In the context of the RLA, however, the Supreme Court *has* held that the specific provisions of the RLA trump the NLGA—or at least that in order to accommodate both, the NLGA does not divest a court of jurisdiction to enjoin compliance with the RLA's specific mandates.[23]

For this same reason, *Bohack*, 541 F.2d 312, which Appellants similarly invoke, also is inapt. In that case, which arose under the NLRA, the court acknowledged that § 301 of the NLRA, 29 U.S.C. § 185,[24] *does* provide jurisdiction, despite the restrictions of the NLGA, to enjoin protected union activity under certain carefully defined circumstances—but in *Bohack* those circumstances did not exist. Specifically, as elaborated in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), in aid of jurisdiction under § 301 to enforce collective bargaining agreements, a district court can enjoin a *strike in violation of a contractual no-strike clause where the subject of the dispute is covered by a mandatory arbitration*

clause, as long as the employer is ordered to arbitrate as a condition of obtaining an injunction against the strike. In *Bohack* such circumstances did not exist because the employer had not been ordered to arbitrate. *See* 541 F.2d. at 318. Thus, *Bohack* itself acknowledged that reconciling the NLGA and the NLRA permitted injunctions in certain circumstances. It was in this context, therefore, that the Second Circuit stated that a Chapter 11 filing does not give a debtor "immunity" from union action and that "the power to permit rejection of the agreement in particular circumstances does not confer an antecedent jurisdiction on the court to enjoin picketing in spite of the Norris–La-Guardia Act." *Id.* at 318. It specifically concluded "that the district court did not have jurisdiction, *without ordering arbitration,* to enjoin the picketing or other lawful union activity." *Id.* (emphasis added). Accordingly, *Bohack* is simply distinguishable, as it was decided pursuant to the *Boys Markets* exception and is inapplicable to the current situation.[25]

**23.** Moreover, in what may have been dicta, the Second Circuit noted that the general concern for the preservation of estates demonstrated in the automatic stay provisions has had a long history, and thus the NLGA was in a sense the later-passed and more specific statute. *See id.* at 300 ("Concern for the preservation of estates in bankruptcy and prevention from interference in their status quo has had a long history and effective remedies bottomed on the concept of custodia legis, but with exceptions and limitations. It is as true of the present law as it was of that of 1867, that the filing of the petition is a caveat to all the world, and in effect an attachment and injunction. Congress, pursuant to its constitutional powers, carved out an exception in labor disputes by withdrawing jurisdiction of all United States courts.") (quotation and citations omitted). In contrast, § 1113 was passed after the NLGA, and embodies not just a general concern for the preservation of assets of the estate, but a specific, highly tailored method for carrying out that concern beyond merely a stay, a remedy that gives the

debtor judicial authority to modify the status quo. The lower court's opinion, which the Second Circuit affirmed, expressed similar reasoning. *See In re Petrusch*, 14 B.R. 825, 829 (N.D.N.Y.1981) (holding that "the specific jurisdictional dictates of the Norris–La-Guardia Act must take precedence over the general power of the Bankruptcy Court. It is a fundamental tenet of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum, regardless of the priority of the enactment.").

**24.** Section 301 was added through the Labor Management Relations Act of 1947, 61 Stat. 156, which amended the NLRA.

**25.** Moreover, the strike in *Bohack* did not occur in response to a petition to reject a collective bargaining agreement, but in response to an employer's refusal to honor a grievance award directing the employer to

Finally, on the basis of the preceding analysis this Court finds the Eighth Circuit's decision in *Briggs* not controlling in the case at hand. In *Briggs,* the Eighth Circuit refused to enjoin a strike following a court-approved abrogation of a collective bargaining agreement on the ground that Congress did not "silently repeal[ ]" the NLGA through a bankruptcy code provision allowing abrogation of collective bargaining agreements. 739 F.2d at 344. Section 365(a) did not "automatically lift[ ]" the jurisdictional restrictions of the NLGA. *Id.* at 342. The Eighth Circuit reasoned that the NLGA was designed "in large measure to prevent federal courts from enjoining the legitimate exercise of the rights of American workers created and protected by the National Labor Relations Act," and that holding otherwise would "unnecessarily limit those rights." *Id.* at 344. However, in the RLA context, the Supreme Court has repeatedly held that where appropriate to ensure compliance with the RLA, an injunction may issue. In this regard, the Court notes that the *Briggs* court stressed that an "important factor" in its decision was that "to the extent that the nature or conduct of the unions' activities violates provisions of state or federal law, relief from such activities may be available ... under established statutory and case law in the same measure as given to other employers." *Id.* at 344. Here, a statutory scheme not present in *Briggs* plays a role: the RLA. Briggs did not analyze whether post–§ 1113 activity by a party who still has obligations under the RLA was enjoinable.

## 2. *Accommodating the NLGA to § 2 (First) of the RLA*

These principles apply with equal force to enforcement of an employer's or a un-

ion's RLA Section 2 (First) duties. The Supreme Court has stated that "[i]n the event of irreconcilable conflict between the policies of the earlier, general provisions of the Norris–LaGuardia Act and those of the subsequent, more specific provisions of § 2 (First), the latter would prevail under familiar principles of statutory construction." *Chicago & North Western,* 402 U.S. at 582 n. 18, 91 S.Ct. 1731. *See also Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 238 F.3d 1300, 1307 (11th Cir.2001) ("It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a 'specific provision' of the RLA and, moreover, is central to the purpose and functioning of the RLA. Therefore, the provision takes precedence over the more general provisions of the NLGA.... We therefore hold that when this specific provision of the RLA is implicated and there is no other effective way to enforce the RLA, the NLGA does not prohibit a federal court from issuing an appropriate injunction."); *Air Cargo Inc., v. Local Union 851, Int'l Bhd. of Teamsters,* 733 F.2d 241, 247–48 (2d Cir.1984) ("If the court concludes that the union was not violating the ... status quo, the district court may still issue an injunction if it finds that a party is not making an effort to settle disputes without interruption to commerce. ... Depending on whether the district court finds that the union's actions were ... violative of section 2 First, it may or may not grant an injunction without regard to whether the dispute was major or minor or what the status quo was.").

■ The overwhelming weight and consistency of the preceding authority compels a determination that the AFA is wrong, and the Bankruptcy Court erred, in stating that *Chicago & North Western,*

---

comply with the collective bargaining agreement; the employer petitioned for rejection of the collective bargaining agreement after the

grievance award and after the strike occurred. *See id.* at 315.

which held that § 2 (First) is a legal obligation, enforceable by injunction in appropriate circumstances, *see* 402 U.S. at 577–83, 91 S.Ct. 1731, is not controlling because it applies only to cases where the employer acted in bad faith or with desire not to reach an agreement. This Court finds no such limitation. The Supreme Court there "ha[d] no occasion to determine whether § 2 First requires more of the parties than avoidance of 'bad faith.'" 402 U.S. at 579 n. 11, 91 S.Ct. 1731. Instead, it held that Section 2 (First) prohibited going through the Section 6 process with a "desire not to reach an agreement." *Id.* It cautioned that "great circumspection should be used" in going beyond such cases, because doing so "risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements." *Id.* However, while "[t]hese weighty considerations indeed counsel restraint in the issuance of strike injunctions based on violations of § 2 First," *id.* at 583, 91 S.Ct. 1731, the Supreme Court nonetheless held that § 2 (First) was judicially enforceable by injunction and left the content of this obligation to be developed by the Courts "on a case-by-case basis." *Id.* at 577, 91 S.Ct. 1731. Such a result was "unavoidable" in order for the Court to give effect to *all* of Congress's labor laws "enacted as they were by Congresses of differing political makeup and differing views on labor relations—rather than restrict our examination to those pieces of legislation which are in accord with our personal views of sound labor policy." *Id.* at 583–84, 91 S.Ct. 1731. This Court has weighed this caution in reaching its conclusion here.

### 3. *The Section 2 (First) Duty in This Case*

The Court must therefore apply these principles to determine whether an injunction against a strike by the AFA is necessary to ensure compliance with the RLA's mandate to the parties to "exert every reasonable effort" to "settle *all disputes,* whether arising out of the application of such agreements *or otherwise,* in order to avoid any interruption to commerce or to the operation of any carrier." 45 U.S.C. § 152 (emphasis added). This Section 2 (First) duty is the "heart" of the RLA. *Chicago & North Western,* 402 U.S. at 574, 91 S.Ct. 1731. It has been left to the courts to determine, on a case-by-case basis, the scope of its contours. *See id.* at 577, 91 S.Ct. 1731.

Here, the Court finds that in the context of a Bankruptcy Court § 1113 order authorizing the debtors to reject a collective bargaining agreement, where the parties are still in the RLA Section 6 procedures, the best way to accommodate the competing demands of the Bankruptcy Code and the RLA is to conclude that in such circumstances, because the Bankruptcy Court has determined that such rejection is necessary to an insolvent carrier's reorganization, is fair and equitable to all parties, and the proposal to modify the agreement is defeated by the employees without good cause, such modification does not constitute an act of bad faith, or an arbitrary or otherwise unlawful unilateral change of the status quo. Accordingly, the AFA would not "exert every reasonable effort" to maintain an agreement with Northwest or to settle all disputes without disruption to commerce by refusing to continue bargaining pursuant to Section 6 procedures for new terms, particularly in view of Northwest's reorganization proceeding, the significantly greater peril to the survival of an airline and its operations and the consequential disruption to commerce that any strike action would pose under these circumstances, and the premature curtailment of the statutory role of the

NMB that the AFA's termination of the Section 6 procedures would produce. *See Chicago & North Western,* 402 U.S. at 576, 91 S.Ct. 1731 (quoting the statement of Donald R. Richberg in the legislative history of the RLA asserting that " 'it is (the parties') duty to exert every reasonable effort ... to settle *all disputes,* whether arising *out of the abrogation of agreements or otherwise* ' ") (emphasis added).

■ Reasonableness is a relative concept and contextually dependent. What is reasonable effort to avoid disruption of commerce in the case of a solvent carrier may fall short in the case of an insolvent carrier. The financial vulnerability of the latter necessarily raises the likelihood and the magnitude of the consequences of disruption of commerce by a strike. While the Court recognizes that the threat to profit margins is exactly the objective of a lawful economic weapon such as a strike, in the case of an employer in bankruptcy, Congress has indicated that the insolvency of a carrier is of great enough concern that it can warrant rejection of an RLA collective bargaining contract. Under such circumstances, the bar of what satisfies the test of reasonableness may be justifiably raised, and the obligation to exercise restraint to avoid disruption to commerce may be correspondingly heightened. In short, it may not be reasonable for the AFA to engage in actions that would undercut a Congressionally-sanctioned remedy that an insolvent air carrier invoked in order to remain operational and avert disruptions of commerce, while at the same time that carrier, as this Court interprets the RLA, remains obligated to continue bargaining collectively under the RLA procedures.

Resorting to a strike as a response to the insolvent carrier's lawful action under these circumstances would be especially disproportionate because the Bankruptcy Court's granting Northwest approval to reject its collective bargaining agreement with the AFA, or the implementation of that authority, in and of itself would not result in a disruption of commerce, but the AFA's strike necessarily would lead to a disruption of commerce and to the operation of the carrier. Such disruption would occur not only as an immediate result of any work stoppage by the flight attendants, but perhaps more permanently were such a strike to drive Northwest into liquidation, as the Bankruptcy Court found could happen here. *See Atlantic Coast II,* 125 F.3d at 43 (noting that while the airline's duty to exert a reasonable effort to reach an agreement was not necessarily breached because it implemented changes to working conditions, "[t]he Union's decision to strike, however, would necessarily violate its duty to negotiate in good faith to avoid a work stoppage under the RLA").

Here, the AFA did not challenge the findings of the § 1113 Order. It takes the view that it is not obligated to continue bargaining under Section 6 through the NMB. Yet it has not sought release from NMB mediation on the ground that Northwest's rejection of the collective bargaining agreement under § 1113 warranted such release. The appropriate consequences associated with Northwest's obtaining § 1113 relief when and on the terms that it did—in other words, at the particular stage of the ongoing Section 6 process at which the remedy was sought and granted—could itself be regarded as included among the "all disputes" which the AFA has an obligation under Section 2 (First) to exert all reasonable efforts to settle without disruption to commerce or to Northwest's operation. This is not to say that the NMB can decide the merits of the § 1113 application, as that determination is within the jurisdiction of the Bankruptcy Court, or that the NMB could prevent the

§ 1113 rejection from issuing. However, taking into account the stage at which the parties' collective bargaining stood prior to the § 1113 Order, and how the parties respectively respond to the approval before and immediately after it is carried out, the NMB is uniquely positioned to assess the new, lawfully authorized status quo that emerged from the operation of the § 1113 Order and decide how, if at all, negotiations should proceed under the altered baseline. Failure by the AFA to pursue through further negotiations whatever prospects for consensual resolution that may yet exist even after rejection of the collective bargaining agreement, and its sole declaration that the Section 6 process has automatically concluded, effectively would deprive the NMB of any ability to assess the situation anew, and determine whether any other steps within the scope of its function may indeed still be available to bring about a new agreement so as to avoid a disruption to commerce, or alternatively to conclude, under the circumstances as changed by Northwest's rejection of the labor contract and considering the posture of negotiations such as they exist following the § 1113 approval, that declaring an impasse would be warranted.

In addition, although the flight attendants rejected the second proposal by a margin of 55 percent to 45 percent, the AFA, which had agreed to the proposal, had only an abbreviated period to exhort its members to vote for it. The Section 2 (First) duty could require the union to exert a greater effort to persuade its employees to reach an agreement rather than prematurely resorting to a strike. *See Delta Air Lines*, 238 F.3d at 1309 (§ 2 (First) required pilot union to do more than just admonish its members not to engage in activities that individually may not have been impermissible but collectively could interrupt carrier operation). The Bankruptcy Court concluded that it cannot be said that the AFA refused to bargain in good faith, pointing to 10 days worth of round-the-clock negotiations as soon as it emerged as the certified union. (Op. at 17.) However, this observation takes into account only the period prior to the imposition of the § 1113 Order. Although the Bankruptcy Court concluded that "nothing in § 1113 ... suggests that rejection should trigger an implied obligation on the part of the parties to continue to bargain" (*id.* at 16.), this statement does not consider the existence and applicability of the RLA. As the Bankruptcy Court itself recognized, the NMB has not released the parties from their obligations to continue negotiations. Accommodating § 1113 and the RLA requires that such duty continue beyond implementation of the § 1113 Order, at least until the parties have been clearly released from the NMB process.

 Because this Court finds that an order authorizing rejection of a collective bargaining agreement pursuant to § 1113 does not terminate the Section 6 process, but instead provides a Congressionally authorized emergency remedy for the debtor that effectively allows it to continue in such process, the parties here remain subject to Section 6 and it would be a violation of the AFA's § 2 (First) duties to determine on its own initiative that the Section 6 process has ended, and to strike rather than to continue through that process until its exhaustion as declared by the NMB.

### 4. Harmonizing the RLA and the Bankruptcy Code

The Court returns, as it must to the principle that, "faced with [an] apparent conflict in the language and purposes of the RLA and the Bankruptcy Act," it "must give effect to both statutes to the extent that they are not mutually repugnant." *REA Express*, 523 F.2d at 169. In

*REA Express* the Second Circuit concluded, prior to *Bildisco,* that a collective bargaining agreement under the RLA could be rejected in bankruptcy because this best balanced the purposes of *both* statutes. To hold that the RLA precluded rejection where the district court found it was necessary to the debtors' attempt at reorganization, would "defeat the purpose of the RLA itself ... since the end result could well be to preclude financial reorganization and thus lead to its demise. There then would simply be no operations left to disrupt." *Id.* The same holds true for the question of whether a union should be allowed to strike after a § 1113 rejection. By operation of § 1113 itself, the rejection of a collective bargaining agreement can occur only after the debtor demonstrates that rejection is necessary to reorganization, is fair and equitable, and the proposed modifications have been refused by the union without good cause. Allowing a strike in such circumstances would undermine the purposes of the RLA as well as the Bankruptcy Code, as RLA negotiating procedures "assume that the carrier involved is viable and will be able to meet its payroll and contractual obligations to employees and other creditors." *Id.* On the other hand, enjoining a strike on this basis would be consistent with the purposes of both the RLA and § 1113, and not contrary to the NLGA insofar as the RLA would control under these circumstances.

■ Reconciling the RLA and the Bankruptcy Code in the manner described above is consistent with the purpose of both statutes. The RLA embodies a strong policy of protecting the nation's carriers from work stoppages; strikes are permissible only where the employer has acted in bad faith, arbitrarily or otherwise unlawfully, or where the parties have exhausted their RLA Section 6 obligations and have been released by the NMB. The Bankruptcy Code embodies a strong policy in favor of reorganization. *See In re Chateaugay Corp.,* 94 F.3d 772, 775 (2d Cir. 1996) (noting "important public policy favoring orderly reorganization and settlement of debtor estates") *In re Stanwich Fin. Servs. Corp.,* 288 B.R. 24, 26–27 (Bankr.D.Conn.2002) ("A basic assumption that underlies American bankruptcy law is that it is often preferable to encourage and facilitate rehabilitation of businesses in financial trouble instead of providing for liquidation only."); *In re United Health Care Org.,* 210 B.R. 228, 233 (S.D.N.Y. 1997) ("[O]ne of the overriding purposes of the Bankruptcy Code is to provide debtors with breathing room from their creditors to increase the chances of a successful reorganization."); *In re Chateaugay Corp.,* 201 B.R. 48, 72 (Bkrtcy.S.D.N.Y.1996) ("Public policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and the concomitant preservation of jobs and going concern values."); 7 *Collier on Bankruptcy* ¶ 1100.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize its business rather than simply to liquidate a troubled business."); *see also Bildisco,* 465 U.S. at 528, 104 S.Ct. 1188 ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."). Therefore, except to the limited extent that the debtor is authorized by the Bankruptcy Court under § 1113 to modify terms and conditions of a collective bargaining agreement in order to progress toward reorganization, the carrier in reorganization and the union as well remain bound by RLA proce-

dures even after approval of a § 1113 order.

*Bildisco* rejected the union's contention that an employer had committed an unfair labor practice in violation of the NLRA by changing the terms of its collective bargaining agreement between filing for bankruptcy and bankruptcy court authorization of the agreement. The Court held that "acceptance of such a contention would largely, if not completely, undermine whatever benefit the debtor-in-possession otherwise obtains by its authority to request rejection of the agreement." *Bildisco*, 465 U.S. at 529, 104 S.Ct. 1188. Although Congress has by statute prohibited such changes until Bankruptcy Court approval, *see* § 1113(f), once the debtor obtains such approval, the same principle follows: concluding that a debtor, by acting legally to obtain the benefits of one statute, violates the other, undermines any benefit the debtor otherwise obtains.

Where the carrier in reorganization chooses to avail itself of a statutory reprieve—a helping hand that Congress itself extended to the carrier as a means to remain solvent long enough to remain in Section 6 negotiations and enable the carrier to fulfill its own obligation to exert every reasonable effort to avert interruption of commerce or the carrier's operations—in construing the RLA's status quo provisions, the airline's action should not be deemed an arbitrary, unilateral contractual change, but a temporary remedial measure taken by operation of law. *See Bildisco*, 465 U.S. at 533, 104 S.Ct. 1188; *Atlantic Coast II*, 125 F.3d at 44. Northwest's actions, taken in the context of its reorganization proceeding, and subject to the strict oversight, supervision, and approval of the Bankruptcy Court, cannot be deemed the type of bad faith or arbitrary action that would justify termination of the

Section 6 procedure and a strike by the AFA.

To hold that under these circumstances the carrier's resort to a statutory remedy releases the union automatically to declare and wage a war that ends the Section 6 process, would interrupt commerce and could lead to a liquidation of the insolvent carrier. Such a course would render § 1113 not a remedial measure, but a means of the insolvent carrier's self-destruction, contrary to the purpose of both the RLA and the Bankruptcy Code. Treating the debtor's legally-authorized pursuit of rejection under the Bankruptcy Code as a violation of a labor law provision "would run directly counter to the express provisions of the Bankruptcy Code and to the Code's overall effort to give a debtor-in-possession some flexibility and breathing space." *Bildisco*, 465 U.S. at 532, 104 S.Ct. 1188. By the very existence of § 1113, Congress has given the rehabilitative goal of § 1113 precedence over labor law in order to permit rejection of collective bargaining agreements. *Burlington* does not compel a different result. In *Burlington* the Court declined to infer, from Section 2 (First)'s general language, that Section 2 (First) encompassed a ban on secondary picketing, and thus held that the NLGA divested federal courts of jurisdiction to enjoin such picketing once the parties had exhausted the RLA procedures and had been released in to self-help. In rejecting the argument that a prohibition on secondary picketing could be inferred from the general language of Section 2 (First), the *Burlington* Court noted that while it is appropriate to construe a particular provision of an Act in light of the Act's structure and purpose, the type of inference that was drawn in cases involving the RLA and the NLGA has been somewhat limited. *See* 481 U.S. at 451 n. 15, 107 S.Ct. 1841.

*Burlington*, however, does not bar the Court's conclusion in this case that Section 2 (First) forbids a strike at this point. In *Burlington*, the parties had exhausted the Section 6 remedies, and the RLA clearly reflects self-help without limitation once the parties have exhausted the status quo procedures. *See Jacksonville Terminal*, 394 U.S. at 378–79, 89 S.Ct. 1109 ("Implicit in the statutory scheme ... is the ultimate right of the disputants to resort to self-help...."). Here, however, the parties have not formally exhausted the status quo procedures. Moreover, the Court here must interpret the Section 2 (First) duties in a situation where the parties are also operating under and subject to the Bankruptcy Code and § 1113 of that statute. Whereas in *Burlington*, nothing in the statute or the legislative history suggested that Congress intended to limit the range of self-help once the Section 6 procedures had been exhausted, here an implied limit on the union's ability to strike can be inferred from the existence of § 1113 itself—which expresses a Congressional intent to allow rejection of collective bargaining agreements.

At the same time, the § 1113 rejection cannot be considered the final stop. Section 1113 does not dispense with a carrier's obligation to negotiate even after rejection of its collective bargaining agreements. Under Section 6, the parties must continue to negotiate, and the carrier as well as the union have a duty to continue such negotiations in good faith. Thus, where a debtor succeeds in making a showing under § 1113 that rejection of its collective bargaining agreements is necessary to reorganization, that modification is essentially temporary; the debtor carrier can implement the necessary changes only until the parties bargain to a new contract. In further collective bargaining, what the union lost through the rejection of its labor agreement potentially could be restored or mitigated in some way in the ultimate consensual agreement that emerges from continuing negotiations. If, ultimately, there is an impasse, then after the process is exhausted the parties may engage in self-help. Under this analysis, the union thus does not lose its right to strike. Instead, such right is only deferred until the end of the Section 6 process, as contemplated by the RLA. Upon exhaustion, the RLA's lengthy procedures for resolution of major disputes no longer restrain the union, and the NLGA presumably would apply to bar injunctive relief to the carrier if the union elects to strike. In the meantime, there is opportunity, through further negotiation and mediation, to reach an agreement that could in acceptable ways take into account any loss that may have temporarily been experienced by reason of the § 1113 Order.

The Court's solution is consistent with the policies and purposes of each of the four statutes at issue here. It is consistent with the RLA because it discourages strikes and interruptions to the transportation industry. It is consistent with the Bankruptcy Code because it encourages a solution that promotes reorganization. To the extent that the NLRA is relevant to this dispute, it is consistent in recognizing the fundamental differences between the labor dispute regimes created by Congress for public carriers and for other industries. Finally, it is consistent with the NLGA because that statute does not bar injunctions against violations of other labor laws, and here there is a violation of the Section 2 (First) duty to exert every reasonable effort to avoid strikes and disruptions to the operations of a carrier—whereas if the union does exert every reasonable effort, to no avail, and is released from mediation by the NMB, it would be free to strike and could not be enjoined.

In *Chicago River*, the Supreme Court observed that the NLGA "aimed to correct existing abuses of the injunctive remedy in labor disputes.... Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital." 353 U.S. at 40, 77 S.Ct. 635. However, it held that the NLGA "cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved." *Id.* It reconciled the NLGA with the RLA by resort to the NLGA's legislative history. Representative LaGuardia, during the floor debates on the statute, himself "recognized that the machinery of the Railway Labor Act channeled these economic forces, in matters dealing with railway labor, into special processes intended to compromise them. Such controversies, therefore, are not the same as those in which the injunction strips labor of its primary weapon without substituting any reasonable alternative." *Chicago River*, 353 U.S. at 40–41, 77 S.Ct. 635. Here, this alternative remains. The AFA is not left without remedy, as it can continue the Section 6 process and, upon exhaustion, resort to self-help.

## E. CONCLUSION

Although this Court concludes that the Bankruptcy Court erred on the law in determining that it was without jurisdiction to enjoin a strike, a review of the transcript of the hearing before the Bankruptcy Court and the exhibits admitted into evidence during that hearing shows that its factual findings were supported by the record and therefore not clearly erroneous. It found that the testimony demonstrated that the AFA's proposed self-help strategy "would have a seriously adverse effect on the Debtors' prospects for reorganization and on the traveling public generally," and that the evidence demonstrated that "the threat of CHAOS would likely cause the Debtors serious injury, perhaps leading to their liquidation, and that it would be highly detrimental to the interest of the public in a sound and reliable transportation system." (Op. at 6–7.) Moreover, in its § 1113 decision the Bankruptcy Court found that the § 1113 Order was necessary, fair and equitable to all parties, and was rejected by the flight attendants without good cause. These findings have not been appealed. Finally, the parties have not been released from the Section 6 process by the NMB. In the face of this factual record, it was error to conclude that the union had complied with its § 2 (First) duties to exert every reasonable effort to settle disputes without resort to strikes and thus that the court was without jurisdiction to enjoin a strike.

The Court will remand the case to the Bankruptcy Court for further findings consistent with this opinion. Because it found that it was without jurisdiction, the Bankruptcy Court did not address the remaining elements for preliminary injunctive relief. However, this Court determines that the record before it demonstrates that Northwest has met this standard, warranting a preliminary injunction pending resolution of the merits. To prevail in an application for a preliminary injunction, the movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Long Island R.R. Co.*, 874 F.2d at 910.

The record demonstrates that Northwest faces irreparable harm absent

an injunction. Evidence on the record before the Bankruptcy Court demonstrated that even the threat of CHAOS would likely cause the Debtors serious injury by having a serious adverse effect on Northwest's prospects for reorganization, perhaps leading to its liquidation. Loss of an ongoing business can constitute irreparable harm. *See Roso–Lino Beverage Distribs. Inc. v. Coca–Cola Bottling Co. of New York, Inc.,* 749 F.2d 124, 125–26 (2d Cir.1984) (holding that loss of an "ongoing business representing many years of effort and the livelihood" of its owners constitutes irreparable harm); *Travellers Int'l AG v. Trans World Airlines, Inc.,* 684 F.Supp. 1206, 1216 (S.D.N.Y.1988) ("[L]oss of a business constitutes irreparable injury and thus is not compensable by a damage award."); *see also Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 38 (2d Cir.1995) (holding that where loss of a product will cause the destruction of a business itself, the availability of money damages may be a "hollow promise" and a preliminary injunction appropriate). Moreover, "[i]n making the determination of irreparable harm, both harm to the parties and to the public may be considered." *Long Island R.R. Co.,* 874 F.2d at 910–11. Here, the record also demonstrates that the public will be harmed: as the Bankruptcy Court found, Northwest carries 130,000 passengers per day, has 1,200 departures per day, is the one carrier for 23 cities in the country, and provides half all airline services to another 20 cities.

In light of the analysis set forth in this opinion, Northwest has certainly demonstrated at least fair ground for further litigation of its claim, if not a likelihood of success on the merits. In light of Northwest's prospects for reorganization and the impact on the traveling public, the hardships tip decidedly in favor of Northwest. In contrast to those hardships, the AFA and the employees it represents must continue to work under terms and conditions of employment imposed on July 31, 2006 that the Bankruptcy Court already determined to be fair and equitable and rejected by the flight attendants without good cause, and must settle their disputes pursuant to the procedures in the RLA. *See Metro–North Commuter R.R. Co. v. Local 808, Int'l Bhd. of Teamsters,* No. 88 Civ. 6257, 1988 WL 103359, at *7 (S.D.N.Y. Sept. 27, 1988) (balance of hardships tipped toward RLA employer when only hardship faced by employees was that employees "will go back to work and must settle their disputes with the railroad pursuant to the procedures set forth in the RLA and the collective bargaining agreement"). Accordingly, this Court finds that preliminary injunctive relief should issue until the Bankruptcy Court has had sufficient time to conduct further proceedings in accordance with this decision, and to issue a ruling accordingly.

## VI. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the Order of the Bankruptcy Court dated August 17, 2006, denying Appellant Northwest Airlines Corporation ("Northwest") preliminary injunctive relief is reversed; and it is further

**ORDERED** that this action is remanded to the Bankruptcy Court for further proceedings consistent with this opinion; and it is further

**ORDERED** that pending a final decision on the merits by the Bankruptcy Court, Appellees, Association of Flight Attendants–CWA (together with its officers, representatives, and Northwest employees named as defendants) ("AFA"), their agents, successors, deputies, servants, and employees, and all persons and organizations acting in concert with them, are

hereby enjoined from calling, permitting, engaging in, instigating, encouraging, participating in, authorizing, or approving self-help of any kind, including, but not limited to, any strike, work-stoppage, action Appellees refer to as "Create Havoc Around Our System" or "CHAOS", sick-out, slow-down, or other concerted refusal to perform normal employment duties; and it is further

**ORDERED** that Appellees and said other persons acting in concert with them shall take all reasonable steps within their power to prevent the actions described above, and to refrain from continuing such actions if commenced; and it is further

**ORDERED** that Appellees shall instruct all Northwest flight attendants to resume or maintain their normal working schedules; and it is further

**ORDERED** that AFA and the individually named Appellees notify, by the most expeditious means possible, all AFA-represented flight attendants employed by Northwest of the issuance, contents, and meaning of this Injunction, and provide a copy of all such notices to Appellants; and it is finally

**ORDERED** that Appellants shall file an undertaking with the Court in an amount to be determined by the Court following further proceedings in this matter, which undertaking shall be deemed sufficient to compensate those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of the injunction granted herein, including all reasonable attorneys' fees and costs associated with defending against Appellants' petition before this Court.

**SO ORDERED.**